**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DORIS STAEHR, Derivatively On Behalf of
LEHMAN BROTHERS HOLDINGS INC.,

          Plaintiff,

    vs.

RICHARD S. FULD, JR., JOSEPH M.
GREGORY, THOMAS A. RUSSO, DAVID
GOLDFARB, STEPHEN M. LESSING,
JEREMY M. ISAACS, CHRISTOPHER M.
O'MEARA, JEFFREY A. WELIKSON,
HENRY KAUFMAN, ROGER S. BERLIND,
JOHN D. MACOMBER, MICHAEL L.
AINSLIE, JOHN F. AKERS, THOMAS H.
CRUIKSHANK, CHRISTOPHER G. GENT,
MARSHA J. EVANS, BRADLEY H. JACK,
JEFFREY VANDERBEEK, MICHAEL F.
MCKEEVER, JOHN L. CECIL, CHARLES
B. HINTZ, ROBERT MATZA, JENNIFER
MARRE, DINA MERRILL and
HIDEICHIRO KOBAYASHI,

          Defendants,

    -and-

LEHMAN BROTHERS HOLDINGS INC., a
Delaware corporation,

          Nominal Defendant.

**07 CV 3562**

C N.

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT FOR
VIOLATIONS OF THE SARBANES
OXLEY ACT OF 2002, SECTION 0(B)
OF THE SECURITIES EXCHANGE ACT
OF 1934, BREACH OF FIDUCIARY
DUTY, ABUSE OF CONTROL, GROSS
MISMANAGEMENT, WASTE OF
CORPORATE ASSETS, UNJUST
ENRICHMENT, ACCOUNTING,
RESCISSION AND FOR A
CONSTRUCTIVE TRUST



RECEIVED
MAY 04 2007
U.S.D.C. S.D. N.Y.
CASHIERS

DEMAND FOR JURY TRIAL

Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.    This is a shareholder derivative action brought by a shareholder of Lehman Brothers Holdings, Inc. ("Lehman Brothers" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including violations of the Sarbanes-Oxley Act ("SOX") of 2002, violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that have caused substantial losses to Lehman Brothers and other damages, such as to its reputation and goodwill. On behalf of Lehman Brothers, this action seeks, among other things, damages, corporate governance reforms, an accounting, rescission, restitution and the declaration of a constructive trust to remedy defendants' violations of state and federal law.

2.    September 11, 2001 marks the date of one of the worst terrorist attacks in American history. The economic aftermath of this attack was both immediate and far reaching. The Dow Jones Industrial Average stock market index ("Dow Jones Index") fell 684 points, or 7.1%, its biggest-ever one-day point decline. By the end of the week, the Dow Jones Index fell 1369.7 points, or 14.3%, its largest one-week point drop in history. In total, stocks traded in the U.S. stock markets lost over $1.2 trillion in value.

3.    Lehman Brothers' stock was similarly affected. As of September 20, 2001, the Company's stock had plummeted by over 25%. On that precise day, certain defendants charged with administering Lehman Brothers' stock option plans granted Lehman Brothers' Chief Financial Officer ("CFO") and Chief Legal Officer ("CLO")—defendants David Goldfarb ("Goldfarb") and Thomas A. Russo ("Russo"), respectively—options to purchase 300,000 shares.

4.    Defendants' timing was extremely fortuitous because within weeks Lehman Brothers' shares would recover to surpass their September 11 levels, and Goldfarb and Russo's spectacularly-

well-timed options grant would appreciate by over $3.7 million. This options grant and Lehman

Brothers' stock price following the September 11th attack are illustrated by the following graph:



5.      Defendants' dating of Goldfarb and Russo's 300,000 options on September 20, 2001

was not luck, however. It was part of a grander scheme dating back to at least 1995, whereby

defendants caused or allowed Lehman Brothers insiders to manipulate their stock-option grants dates

so as to secretly maximize their profits from the stock options. Specifically, certain Lehman

Brothers insiders—with the benefit of hindsight—cherry-picked their respective stock-option grant

dates to take advantage of lower exercise prices than the price on the actual grant date. The price of

Lehman Brothers shares on the reported option-grant date, therefore, was lower than the share price

on the actual day options were issued. Thus, this illegal stock option manipulation—referred to as

backdating by the media and academics—brought Lehman Brothers insiders an instant paper gain.

By engaging in this scheme, defendants were able to conceal from investors that the Company was

not recording material compensation expenses and materially overstating Lehman Brothers' net

income and earnings per share.

- 2 -

6.    In short, the September 20, 2001 grants were yet another opportunity for defendants to make a quick buck at the Company's expense. Indeed, by 2006, these defendants and others had allowed themselves to sell over $1.4 billion worth of Lehman Brothers stock—many of which was gained from the exercise of illegally manipulated options—and realize millions of dollars in illicit compensation through the exercise of backdated option grants and subsequent sale of the Company's stock. Making matters worse, defendants directed Lehman Brothers to repurchase $14.2 billion worth of its own stock on the open market at inflated prices.

7.    A March 18, 2006 *Wall Street Journal* article titled, "The Perfect Payday: Some CEOs reap millions by landing stock options when they are most valuable. Luck – or something else?" heightened public scrutiny of options granting practices. The article was based upon prior academic research into the timing of option grants at various public companies. That research theorized that wildly improbable option grants—such as defendants' October 2, 2001 grant—could only be explained by the backdating variant of options manipulation.

8.    Besides backdating, options manipulations can include "springloading." "Springloading" involves the timing of options grants to take advantage of non-public positive material information. Specifically, the springloaded options grant is dated just before the positive news release to create a springload effect whereby the option grant immediately appreciates by a substantial amount as the market absorbs the information.

9.    In the months that followed, hundreds of public companies fell under the scrutiny of the Securities and Exchange Commission ("SEC"), Department of Justice and internal investigators. Yet, despite this scrutiny of publicly traded companies, defendants did not initiate any investigation of Lehman Brothers' prior option grant practices or institute corporate governance sufficient to prevent further options manipulations. Defendants also refused to publicly disclose their options manipulating practices.

10.    As a result of the illegal options manipulation practices, Lehman Brothers' prior financials are materially inaccurate and will need to be restated. Thus, Lehman Brothers will need to expend exorbitant costs from directing corporate resources towards this restatement. Further,

Lehman Brothers' business reputation has been severely damaged by defendants' selfish actions, which portray a Company hampered by lack of managerial integrity. Accordingly, this action is necessary to end defendants' illegal option-manipulating practices and to restore assets to the Company that have been squandered via the payment of undisclosed and undeserved compensation to corporate insiders.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C §1331 in that plaintiff's claims arise in part out of the laws of the United States, including the Exchange Act and the Sarbanes-Oxley Act of 2002. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

12.     This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

13.     This Court retains general jurisdiction over each named defendant who is a resident of New York.  Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Lehman Brothers maintains operations in New York and is traded on the New York Stock Exchange, and because the allegations contained herein are brought derivatively on behalf of Lehman Brothers, defendants' conduct was purposefully directed at New York. Defendants' conduct arose out of New York, where Lehman Brothers maintains its corporate headquarters. Finally, exercising jurisdiction over named nonresident defendants is reasonable.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this complaint, including the defendants' primary participation in the wrongful acts detailed herein, aiding and abetting, and

- 4 -

conspiracy in violation of fiduciary duties owed to Lehman Brothers, occurred in substantial part in this District. Finally, defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

15.    Plaintiff Doris Staehr is, and was at times relevant hereto, an owner and holder of Lehman Brothers common stock. Plaintiff is a citizen of California.

16.    Nominal defendant Lehman Brothers is a Delaware corporation with its principal executive offices located at 745 Seventh Avenue, New York, New York. Lehman Brothers provides financial services to corporations, governments and municipalities, institutions, and high-net-worth individuals.

17.    Defendant Richard S. Fuld Jr. ("Fuld") is Lehman Brothers' Chairman of the Board of Directors (the "Board") and has been since April 1994. Fuld is also a Lehman Brothers director and has been since 1984 and Lehman Brothers' Chief Executive Officer ("CEO") and has been since November 1993. Fuld was Lehman Brothers' President and Chief Operating Officer ("COO") from March 1993 to March 1994; Co-President and Co-COO from January 1993 to March 1993; and served in various other positions from 1969 to 1993. Because of Fuld's positions, defendant Fuld knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as, reports and other information provided to him in connection therewith. Fuld received at least 5,400,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Fuld manipulated these stock options and received illegal compensation from Lehman Brothers that was not disclosed to the Company's shareholders. Additionally, defendant Fuld received 2,400,000 springloaded options timed immediately before the

release of positive-previously-undisclosed material information.  Lehman Brothers paid Fuld the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|---|
| Fuld | 2006 | $750,000 | $6,250,000 | $10,903,060 | 700,000 | $12,523,679 | $189,585 |
| | 2005 | $750,000 | $13,750,000 | $14,942,021 | 900,000 | - | $17,791 |
| | 2004 | $750,000 | $10,250,000 | $10,357,143 | 900,000 | - | $16,028 |
| | 2003 | $750,000 | $6,650,000 | $8,000,000 | 400,000 | - | $14,439 |
| | 2002 | $750,000 | $1,050,000 | $5,771,003 | 400,000 | - | $13,008 |
| | 2001 | $750,000 | $4,000,000 | $6,785,299 | 450,000 | - | $12,517 |
| | 2000 | $750,000 | $8,750,000 | $13,572,896 | 800,000 | - | $13,710 |
| | 1999 | $750,000 | $4,500,000 | $7,500,350 | 800,000 | - | $8,778 |
| | 1998 | $750,000 | $2,350,000 | $6,643,437 | 700,000 | - | $7,908 |
| | 1997 | $750,000 | $3,125,000 | $5,536,325 | 325,000 | - | $7,570 |
| | 1996 | $750,000 | $2,000,000 | $3,927,994 | 375,000 | - | $7,528 |
| | 1995 | $750,000 | $145,000 | $2,750,010 | 400,000 | - | $7,556 |

Defendant Fuld sold 5,884,237 of his personally held shares for $498,458,024.39 in proceeds while in possession of material, non-public information concerning the illegally undisclosed manipulated stock option grant practices.  Defendant Fuld is a citizen of Connecticut.

18.    Defendant Joseph M. Gregory ("Gregory") is Lehman Brothers' President and COO and has been since May 2004.  Gregory was also Lehman Brothers' Co-COO from 2002 to 2004; Chief Administrative Officer ("CAO") from 2000 to 2002; Head of Global Equities Division from 1996 to 2000; and held various other positions from 1974 to 1996.  Because of Gregory's position, defendant Gregory knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to him in connection therewith.  Gregory received at least 3,800,000 options that were dated at or very close to the lowest stock price for the month during which options were granted.  Accordingly, on information and belief, plaintiff alleges that Gregory manipulated these stock options and received illegal compensation from Lehman Brothers that was not disclosed to the Company's shareholders.

Additionally, defendant Gregory received 1,700,000 springloaded options timed immediately before the release of positive-previously-undisclosed material information. Lehman Brothers paid Gregory the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | LTIP Payouts | All Other Compensation |
|-----------|------|--------|-------|-------|-------|-------|-------|
| Gregory | 2006 | $450,000 | $5,550,000 | $9,000,167 | 600,000 | $9,411,932 | $10,731 |
| | 2005 | $450,000 | $11,550,000 | $11,542,211 | 700,000 | - | $9,748 |
| | 2004 | $450,000 | $9,050,000 | $7,214,285 | 700,000 | - | $8,782 |
| | 2003 | $450,000 | $5,050,000 | $5,714,629 | 300,000 | - | $7,912 |
| | 2002 | $450,000 | $1,050,000 | $3,571,803 | 300,000 | - | $7,128 |
| | 2001 | $450,000 | $2,800,000 | $4,642,616 | 350,000 | - | $6,373 |
| | 2000 | $450,000 | $8,050,000 | $7,857,992 | 600,000 | - | $5,339 |
| | 1999 | $450,000 | $3,550,000 | $4,285,914 | 700,000 | - | $4,810 |
| | 1998 | $450,000 | $2,300,000 | $3,928,915 | 600,000 | - | $4,333 |

Defendant Gregory sold 4,709,080 of his personally held shares for $387,149,371.48 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant Gregory is a citizen of New York.

19.     Defendant Russo is Lehman Brothers' CLO and has been since 1993. Russo is also Lehman Brothers' Senior Executive Vice President and has been since 1994; member of and counsel to the Firm's Executive Committee and has been since at least 2003; and Vice Chairman of Lehman Brothers Inc. and has been since July 1999. Russo was also a member of the Operating Committee and Corporate Management Committee ("CMC") from 1994 to at least 1998; and Managing Director of Lehman Brothers Inc. from 1993 to July 1999. Because of Russo's position, defendant Russo knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to him in connection therewith. Russo received at least 550,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Russo manipulated these stock options and received illegal compensation from Lehman Brothers that was

- 7 -

not disclosed to the Company's shareholders. Additionally, defendant Russo received 700,000 springloaded options timed immediately before the release of positive-previously-undisclosed material information. Lehman Brothers paid Russo the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|---|
| Russo | 2006 | $450,000 | $4,550,000 | $5,675,819 | 200,000 | $4,753,262 | - |
| | 2005 | $450,000 | $4,550,000 | $3,314,100 | 300,000 | - | - |
| | 2004 | $450,000 | $3,350,000 | $2,928,571 | 300,000 | - | - |
| | 2003 | $450,000 | $2,550,000 | $2,857,314 | 50,000 | - | - |
| | 2002 | $450,000 | $1,050,000 | $1,428,721 | - | - | - |
| | 2001 | - | | | - | - | - |
| | 2000 | - | | | - | - | - |
| | 1999 | - | | | - | - | - |
| | 1998 | - | | | - | - | - |
| | 1997 | $450,000 | $750,000 | $928,674 | 75,000 | - | - |
| | 1996 | $450,000 | $550,000 | $714,182 | 100,000 | - | - |
| | 1995 | $450,000 | $552,500 | $371,873 | 100,000 | - | - |

Defendant Russo sold 1,037,463 of his personally held shares for $93,526,736.73 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant Russo is a citizen of New Jersey.

20.    Defendant Goldfarb is Lehman Brothers' Global Head of Strategic Partnerships, Principal Investing and Risk, and has been since October 2006. Goldfarb also oversees Global Trading Strategies and Global Principal Strategies and has been doing so since October 2006. Goldfarb was also Lehman Brothers' CAO from December 2004 to October 2006; CFO from April 2000 to December 2004; Global Controller from 1995 to 2000; and held various other positions from 1993 to 1995. Because of Goldfarb's positions, defendant Goldfarb knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to him in connection therewith. Goldfarb received at least 1,300,000 options that were dated at or very close to the lowest stock price for the month during which options were granted.

Accordingly, on information and belief, plaintiff alleges that Goldfarb manipulated these stock options and received illegal compensation from Lehman Brothers that was not disclosed to the Company's shareholders. Additionally, defendant Goldfarb received 300,000 springloaded options timed immediately before the release of positive-previously-undisclosed material information. Lehman Brothers paid Goldfarb the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | LTIP Payouts |
|---|---|---|---|---|---|---|
| Goldfarb | 2006 | $450,000 | $2,550,000 | $3,800,070 | 400,000 | $6,019,944 |
| | 2005 | $450,000 | $5,550,000 | $5,199,709 | 600,000 | - |
| | 2004 | $450,000 | $3,950,000 | $4,357,143 | 500,000 | - |
| | 2003 | $450,000 | $2,550,000 | $3,571,643 | 200,000 | - |
| | 2002 | $450,000 | $1,049,000 | $1,787,331 | 575,000 | - |
| | 2001 | $450,000 | $1,550,000 | $1,428,528 | 225,000 | - |

Defendant Goldfarb sold 673,418 of his personally held shares for $64,765,987.50 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant Goldfarb is a citizen of New York.

21.     Defendant Stephen M. Lessing ("Lessing") is Lehman Brothers' Head of Client Relationship Management and has been since 2002. Lessing is also a member of Lehman Brothers' Executive Committee. Lessing was Lehman Brothers' Senior Client Relationship Manager and Head of Private Client Group from April 2000 to 2002; Head of Global Sales and Research from 1996 to April 2000; Head of Global Fixed Income Sales from 1992 to 1996; and held various other positions from 1980 to 1992.   Because of Lessing's position, defendant Lessing knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to him in connection therewith.  Lessing received at least 3,200,000 options that were dated at or very close to the lowest stock price for the month during which options were granted.  Accordingly, on information and belief, plaintiff alleges that Lessing manipulated these

- 9 -

stock options and received illegal compensation from Lehman Brothers that was not disclosed to the Company's shareholders. Additionally, defendant Lessing received 1,400,000 springloaded options timed immediately before the release of positive-previously-undisclosed material information. Lehman Brothers paid Lessing the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|-----------|-------------|--------|-------|------------------------|-------------------------------|------------------------|
| Lessing | 2000 | $450,000 | $8,050,000 | $7,857,992 | 600,000 | $2,347 |
| | 1999 | $450,000 | $3,550,000 | $4,285,914 | 700,000 | $2,114 |
| | 1998 | $450,000 | $2,300,000 | $3,928,915 | 600,000 | $1,905 |

Defendant Lessing sold 764,820 of his personally held shares for $60,262,833.01 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant Lessing is a citizen of New York.

22.     Defendant Jeremy M. Isaacs ("Isaacs") is Lehman Brothers' CEO for Europe and has been since December 1999. Isaacs is also Lehman Brothers' CEO of Asia and has been since April 2000. Isaacs was Lehman Brothers' COO for Europe from March 1999 to December 1999; Head of European Equities from 1997 to 1999; and held various other positions from 1996 to 1997. Because of Isaacs's position, defendant Isaacs knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to him in connection therewith. Isaacs received at least 3,100,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Isaacs manipulated these stock options and received illegal compensation from Lehman Brothers that was not disclosed to the Company's shareholders. Additionally, defendant Isaacs received 700,000 springloaded options timed immediately before the release of positive-previously-undisclosed material information. Lehman Brothers paid Isaacs the following compensation:

- 10 -

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|---|
| Isaacs | 2001 | $450,000 | $2,800,000 | $4,642,616 | 350,000 | $9,499 |
|  | 2000 | $450,000 | $8,050,000 | $7,857,992 | 600,000 | $7,200 |

Defendant Isaacs sold 440,000 of his personally held shares for $29,366,275 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant Isaacs is a citizen of New York.

23.    Defendant Christopher M. O'Meara ("O'Meara") is Lehman Brothers' Executive Vice President and CFO and has been since December 2004. O'Meara was Lehman Brothers' Global Controller from April 2002 to December 2004; Financial Controller from April 2001 to April 2002; and Assistant Controller from July 1995 to April 2001. From 1994 to July 1995, O'Meara held various management positions in Lehman Brothers' Finance Division, including Head of Expense Management, CFO of the Investment Banking Division and Head of Financial Management Information. Because of O'Meara's positions, defendant O'Meara knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to him in connection therewith.    Lehman Brothers paid O'Meara the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards |
|---|---|---|---|---|
| O'Meara | 2006 | $200,000 | $2,300,000 | $3,571,495 |
|  | 2005 | $200,000 | $2,500,000 | $2,571,285 |

Defendant O'Meara sold 19,642 of his personally held shares for $2,310,832.12 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant O'Meara is a citizen of New York.

24.     Defendant Jeffrey A. Welikson ("Welikson") is Lehman Brothers' Vice President and Corporate Secretary and has been since about February 2001. Welikson was also a Lehman Brothers Trustee from about March 2003 to at least January 2005. Because of Welikson's positions, defendant Welikson knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to him in connection therewith. Defendant Welikson is a citizen of New Jersey.

25.     Defendant Henry Kaufman ("Kaufman") is a Lehman Brothers director and has been since 1995. Because of Kaufman's position, defendant Kaufman knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as, reports and other information provided to him in connection therewith. Defendant Kaufman sold 25,000 of his personally held shares for $1,547,158 in proceeds while in possession of material, non-public information concerning the illegally undisclosed manipulated stock option grant practices. Defendant Kaufman is a citizen of New Jersey.

26.     Defendant Roger S. Berlind ("Berlind") is a Lehman Brothers director and has been since 1985. Berlind was a member of Lehman Brothers' Audit Committee from 1995 to 2007 and Chairman of the Audit Committee from 1997 to 2003. Because of Berlind's position, defendant Berlind knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and

- 12 -

committees thereof, as well as, reports and other information provided to him in connection therewith. Defendant Berlind is a citizen of New York.

27.    Defendant John D. Macomber ("Macomber") is a Lehman Brothers director and has been since 1994. Macomber is a member of Lehman Brothers' Compensation and Benefits Committee and has been since 1995. Macomber was also Chairman of Lehman Brothers' Compensation and Benefits Committee from 1996 to 2004 and a member of Lehman Brothers' Audit Committee in 1995. Because of Macomber's positions, defendant Macomber knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as, reports and other information provided to him in connection therewith. Defendant Macomber is a citizen of District of Columbia.

28.    Defendant Michael L. Ainslie ("Ainslie") is a Lehman Brothers director and has been since 1996. Ainslie is a member of Lehman Brothers' Audit Committee and has been since 1996. Because of Ainslie's positions, defendant Ainslie krew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as, reports and other information provided to him in connection therewith. Defendant Ainslie is a citizen of Florida.

29.    Defendant John F. Akers ("Akers") is a Lehman Brothers director and has been since 1996. Akers was a member of Lehman Brothers' Compensation and Benefits Committee from 1998 to 2004 and Chairman of the Compensation and Benefits Committee from 2004 to 2006. Because of Akers' positions, defendant Akers knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents,

- 13 -

conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as, reports and other information provided to him in connection therewith. Defendant Akers is a citizen of Connecticut.

30.    Defendant Thomas H. Cruikshank ("Cruikshank") is a Lehman Brothers director and has been since 1996. Cruikshank is Chairman of Lehman Brothers' Audit Committee and has been since 2004. Cruikshank was a member of Lehman Brothers' Audit Committee from 1996 to 2003. Because of Cruikshank' positions, defendant Cruikshank knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as, reports and other information provided to him in connection therewith. Defendant Cruikshank is a citizen of Texas.

31.    Defendant Christopher G. Gent ("Gent") is a Lehman Brothers director and has been since 2003. Gent is a member of Lehman Brothers' Audit Committee and has been since 2005. Gent was a member of Lehman Brothers' Compensation and Benefits Committee from 2004 to 2006. Because of Gent's positions, defendant Gent knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as, reports and other information provided to him in connection therewith. Defendant Gent is a citizen of England.

32.    Defendant Marsha J. Evans ("Evans") is a Lehman Brothers director and has been since 2004. Evans is a member of Lehman Brothers' Compensation and Benefits Committee and has been since 2006. Because of Evans' positions, defendant Evans knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and

- 14 -

employees, attendance at Board meetings and committees thereof, as well as, reports and other information provided to her in connection therewith. Defendant Evans is a citizen of Virginia.

33.    Defendant Bradley H. Jack ("Jack") served in Lehman Brothers' Office of the Chairman from May 2004 to at least 2005. Jack was also Lehman Brothers' Co-COO from May 2002 to May 2004, Head of Investment Banking from 1996 to 2002 of Lehman Brothers' Executive Committee; and sector head for Investment Banking's businesses involving Debt Capital Markets, Financial Services, Leveraged Finance and Real Estate from 1993 to 1996. Because of Jack's positions, defendant Jack knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to him in connection therewith. Jack received at least 3,000,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Jack manipulated these stock options and received illegal compensation from Lehman Brothers that was not disclosed to the Company's shareholders. Additionally, defendant Jack received 700,000 springloaded options timed immediately before the release of positive-previously-undisclosed material information. Lehman Brothers paid Jack the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|-------|------------------------|-------------------------------|
| Jack | 2003 | $450,000 | $5,050,000 | $5,714,629 | 300,000 |
| | 2002 | $450,000 | $1,050,000 | $3,571,803 | 300,000 |
| | 2001 | $450,000 | $2,800,000 | $4,642,616 | 350,000 |
| | 2000 | $450,000 | $8,050,000 | $7,857,992 | 600,000 |
| | 1999 | $450,000 | $3,550,000 | $4,285,914 | 700,000 |
| | 1998 | $450,000 | $2,300,000 | $3,928,915 | 600,000 |

Defendant Jack sold 2,322,431 of his personally held shares for $157,246,370.08 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant Jack is a citizen of Connecticut.

34.    Defendant Jeffrey Vanderbeek ("Vanderbeek") was Lehman Brothers' Head of Global Risk Management, Private Equity and Strategy from 2002 to June 2004. Vanderbeek was also Head of Lehman Brothers' Capital Markets Division from April 2000 to 2002; Head of Global Fixed Income Division from 1996 to April 2000; COO of the Fixed Income Government Department from May 1993 to 1996; COO of the Fixed Income Derivatives Department from June 1993 to 1996; and held various other positions from February 1984 to May 1993. Because of Vanderbeek's positions, defendant Vanderbeek knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to him in connection therewith. Vanderbeek received at least 3,000,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Vanderbeek manipulated these stock options and received illegal compensation from Lehman Brothers that was not disclosed to the Company's shareholders. Additionally, defendant Vanderbeek received 700,000 springloaded options timed immediately before the release of positive-previously-undisclosed material information. Lehman Brothers paid Vanderbeek the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|-----------|-------------|--------|-------|-------------------------|-------------------------------|------------------------|
| Vanderbeek | 2002 | $450,000 | $1,050,000 | $3,571,803 | 300,000 | $1,004 |
| | 2001 | $450,000 | $2,800,000 | $4,642,616 | 350,000 | $904 |
| | 2000 | $450,000 | $8,050,000 | $7,857,992 | 600,000 | $1,084 |
| | 1999 | $450,000 | $3,550,000 | $4,285,914 | 700,000 | $709 |
| | 1998 | $450,000 | $2,300,000 | $3,928,915 | 600,000 | $610 |

Defendant Vanderbeek sold 1,410,792 of his personally held shares for $96,339,164.48 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant Vanderbeek is a citizen of New Jersey.

35.    Defendant Michael F. McKeever ("McKeever") was Head of Lehman Brothers Private Equity Division from to October 1999 to December 2000. McKeever was also a member of Lehman Brothers' Executive Committee and Operating Committee; Co-Head of Investment Banking from 1996 to 1999; Sector Head in Investment Banking from 1991 to 1996; Co-Head of Equity, 'Debt and Derivatives Origination Business from 1986 to 1990; and held various other positions since about 1979. Because of McKeever's positions, defendant McKeever knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to him in connection therewith. McKeever received at least 2,400,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that McKeever manipulated these stock options and received illegal compensation from Lehman Brothers that was not disclosed to the Company's shareholders. Lehman Brothers paid McKeever the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|-------|-------------------------|-------------------------------|
| McKeever | 1999 | $450,000 | $3,550,000 | $4,285,914 | 350,000 |
|          | 1998 | $450,000 | $2,300,000 | $3,928,915 | 300,000 |

Defendant McKeever sold 398,681 of his personally held shares for $32,260,672.67 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant McKeever is a citizen of Connecticut.

36.    Defendant John L. Cecil ("Cecil") was Lehman Brothers' CFO from July 1998 to April 2000. Cecil was also Lehman Brothers' CAO from January 1994 to April 2000. Because of Cecil's positions, defendant Cecil knew, consciously disregarded, was reckless and grossly negligent

- 17 -

in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to him in connection therewith.   Cecil received at least 2,000,000 options that were dated at or very close to the lowest stock price for the month during which options were granted.  Accordingly, on information and belief, plaintiff alleges that Cecil manipulated these stock options and received illegal compensation from Lehman Brothers that was not disclosed to the Company's shareholders.   Additionally, defendant Cecil received 1,000,000 springloaded options timed immediately before the release of positive-previously-undisclosed material information.  Lehman Brothers paid Cecil the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|-------|-------------------------|-------------------------------|
| Cecil | 1999 | $450,000 | $3,550,000 | $4,285,914 | 350,000 |
| | 1998 | $450,000 | $2,300,000 | $3,928,915 | 300,000 |
| | 1997 | $450,000 | $3,300,000 | $3,214,640 | 225,000 |
| | 1996 | $450,000 | $1,950,000 | $2,285,379 | 250,000 |
| | 1995 | $450,000 | $1,787,500 | $1,203,131 | 200,000 |

Defendant Cecil sold 365,520 of his personally held shares for $24,713,658.26 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices.  Defendant Cecil is a citizen of New York.

37.       Defendant Charles B. Hintz ("Hintz") was Lehman Brothers' CFO from at least April 1996 to at least July 1998.  Because of Hintz's positions, defendant Hintz knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to him in connection therewith.  Lehman Brothers paid Hintz the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|-------|------------------------|-------------------------------|
| Hintz | 1997 | $450,000 | $650,000 | $857,237 | 75,000 |
|  | 1996 | $349,615 | $747,749 | $1,023,356 | 100,000 |

Defendant Hintz sold 39,200 of his personally held shares for $3,044,764.24 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant Hintz is a citizen of New Jersey.

38.     Defendant Robert Matza ("Matza") was Lehman Brothers' Chief Financial Officer from January 1994 to at least 1996. Matza was a member of Lehman Brothers' CMC from 1994 to 1996 and CFO of the Lehman Brothers Division from 1990 to July 1993. Because of Matza's positions, defendant Matza knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to him in connection therewith. Matza received at least 400,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Matza manipulated these stock options and received illegal compensation from Lehman Brothers that was not disclosed to the Company's shareholders. Lehman Brothers paid Matza the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|-----------|-------------|--------|-------|------------------------|-------------------------------|------------------------|
| Matza | 1995 | $450,000 | $487,500 | $328,127 | 100,000 | $568 |

Defendant Matza is a citizen of New York.

39.     Defendant Jennifer Marre ("Marre") was Lehman Brothers' Secretary from about October 1997 to about August 2000. Marre was also a Lehman Brothers Vice President from at least June 1995 to about September 2000. Because of Marre's positions, defendant Marre knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known

- 19 -

that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to her in connection therewith. Defendant Marre received 400,000 springloaded options timed immediately before the release of positive-previously-undisclosed material information. Defendant Marre is a citizen of New York.

40.    Defendant Jeremiah M. Callaghan ("Callaghan") was Lehman Brothers' Chief of Operations and Technology from 1993 to about June 1998. Callaghan was also Managing Director of Lehman Brothers Inc. and head of Lehman Brothers Inc.'s Trading Services Group from December 1993 to about June 1998. Because of Callaghan's positions, defendant Callaghan knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as, reports and other information provided to him in connection therewith. Additionally, defendant Callaghan received 400,000 springloaded options timed immediately before the release of positive-previously-undisclosed material information. Lehman Brothers paid Callaghan the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|-------|-------------------------|-------------------------------|
| Callaghan | 1997 | $450,000 | $950,000 | $1,214,420 | 75,000 |
|           | 1996 | $450,000 | $950,000 | $857,018 | 100,000 |

Defendant Callaghan is a citizen of Florida.

41.    Defendant Dina Merrill ("Merrill") was a Lehman Brothers director from 1988 to April 2006. Merrill was a member of Lehman Brothers' Compensation and Benefits Committee from 1996 to 2006. Because of Merrill's position, defendant Merrill knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers

- 20 -

and employees, attendance at Board meetings and committees thereof, as well as, reports and other information provided to him in connection therewith. Defendant Merrill is a citizen of New York.

42.    Defendant Hideichiro Kobayashi ("Kobayashi") was a Lehman Brothers director from 1997 to at least 2000. Kobayashi was a member of Lehman Brothers' Audit Committee from 1998 to 2000. Because of Kobayashi's position, defendant Kobayashi knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that Lehman Brothers insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as, reports and other information provided to him in connection therewith. Defendant Kobayashi is a citizen of New York.

43.    The defendants identified in ¶¶17, 19, 25-32, 40-42 are referred to herein as the "Director Defendants." The defendants identified in ¶¶17-24, 33-40 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶17-23, 25, 33-38 are referred to herein as the "Insider Selling Defendants." The defendants indentified in ¶¶17-22, 33-36, 38-40 are referred to herein as the "Options Recipient Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

44.    By reason of their positions as officers, directors and/or fiduciaries of Lehman Brothers and because of their ability to control the business and corporate affairs of Lehman Brothers, the Individual Defendants owed Lehman Brothers and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Lehman Brothers in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Lehman Brothers and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

45.    Each director and officer of the Company owes to Lehman Brothers and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the compensation paid to its executives, directors and employees. These disclosures necessarily include the value of stock options granted to the Company's insiders.

46.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Lehman Brothers, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as the Company's disclosures of its financial results including expenses related to stock option grants. Because of their advisory, executive, managerial and directorial positions with Lehman Brothers, each of the Individual Defendants had access to adverse, non-public information about the financial condition and improper representations of Lehman Brothers.

47.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Lehman Brothers, and was at all times acting within the course and scope of such agency.

48.    To discharge their duties, the officers and directors of Lehman Brothers were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Lehman Brothers were required to, among other things:

(a)    Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide accurate disclosures of the Company's financials and to avoid wasting the Company's assets;

- 22 -

(c)     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results, and ensuring that the Company maintained an adequate system of internal controls such that the Company's financial reporting would be true and accurate at all times;

(d)     Remain informed as to Lehman Brothers' internal controls, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securitie laws;

(e)     Ensure that Lehman Brothers was properly handling its tax liabilities;

(f)     Ensure that Lehman Brothers' internal controls were sufficient to prevent stock option manipulations, including but not limited to backdating and springloading; and

(g)     Ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

49.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Lehman Brothers, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprise all of Lehman Brothers' Board.

50.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such improper

actions. As a result of the defendants' improprieties, the Company has and will need to expend significant sums of money.

## THE BOARD AND ITS COMMITTEES' DUTIES CONCERNING LEHMAN BROTHERS' STOCK OPTION PLANS AND OPTION GRANT PRACTICES

51.    The granting of stock options to Lehman Brothers insiders, at times relevant hereto, was controlled by three plans: the Employee Incentive Plan ("Employee Plan"); the 1994 Management Ownership Plan ("1994 Plan"); and the 1996 Management Ownership Plan ("1996 Plan"). The Employee Plan, 1994 Plan and 1996 Plan are collectively referred to as the "Plans."

### The Employee Plan

52.    The Employee Plan contained restrictions on the exercise price of options granted under the plan. Specifically, the Employee Plan provides that the exercise price of options "shall not be less than 100 percent of the Fair Market Value of the Common Stock on the date of grant."

53.    The Employee Plan was to be administered by the Compensation and Benefits Committee. The 1993 Plan specifically provides that "[t]he Plan shall be administered by the Committee, which shall have the power to select those Participants who shall receive Awards and to determine the terms of such Awards."    The Employee plan defines "Committee" as the Compensation and Benefits Committee.

54.    The Compensation and Benefits Committee had the following authority under the Employee Plan:

> Subject to the provisions of the Plan, the Committee shall be authorized to interpret the Plan, to establish, amend and rescind any rules and regulations relating to the Plan, to determine the terms and provisions of any agreements entered into hereunder, and to make all other determinations necessary or advisable for the administration of the Plan. The Committee may correct any defect, supply any omission or reconcile any inconsistency in the Plan or in any Award in the manner and to the extent it shall deem desirable to carry the Plan or any such Award into effect. The determinations of the Committee in the administration of the Plan, as described herein, shall be final and conclusive.

### The 1994 Plan

55.    The 1994 Plan contained restrictions on the exercise price of options granted under the plan. Specifically, the 1994 Plan provides "that the purchase price per Share under each

Incentive Stock Option shall not be less than 100% of the Fair Market Value of a Share on the date the Incentive Stock Option is granted (110% in the case of an Incentive Stock Option granted to a Ten-Percent Stockholder) and the purchase price per Share under each Non-qualified Stock Option shall not be less than 100% of the Fair Market Value of a Share on the date the Non-qualified Stock Option is granted."

56.    The 1994 Plan was to be administered by a committee of the board consisting of at least three independent directors (the "1994 Committee"). The 1994 Plan specifically provides that "[t]he Plan shall be administered by the Committee ... "Committee" means a committee consisting of at least three (3) Disinterested Directors appointed by the Board to administer the Plan and to perform the functions set forth herein."

57.    The 1994 Committee had the following authority under the 1994 Plan:

determine those individuals to whom Options shall be granted under the Plan and the number of Incentive Stock Options and/or Non-qualified Stock Options to be granted to each Eligible Individual and to prescribe the terms and conditions (which need not be identical) of each Option, including the purchase price per Share subject to each Option, and make any amendment or modification to any Agreement consistent with the terms of the Plan; and

*    *    *

to resolve all questions of interpretation arising under or in connection with the administration of the Plan, to exercise its discretion with respect to the powers and rights granted to it as set forth in the Plan, and generally, to exercise such powers and to perform such acts as are deemed necessary or advisable to promote the best interests of the Company with respect to the Plan.

### The 1996 Plan

58.    The 1996 Plan contained restrictions on the exercise price of options granted under the plan. Specifically, the 1996 Plan provides that the exercise price of stock options "shall not be less than 100 percent of the Fair Market Value of the Common Stock on the date of grant."

59.    The 1996 Plan was administered by the Compensation and Benefits Committee. The 1996 Plan specifically provides that "[t]he Plan shall be administered by the Committee ...." "Committee" is defined under the 1996 Plan as the Compensation and Benefits Committee.

- 25 -

60.     The Compensation and Benefits Committee had the authority under the 1996 Plan "to select who shall receive Awards and to determine the terms of such Awards."  The Compensation and Benefits Committee also had the authority:

> to interpret the Plan, to establish, amend and rescind any rules and regulations relating to the Plan, to determine the terms and provisions of any agreements entered into hereunder, and to make all other determinations necessary or advisable for the administration of the Plan. The Committee may correct any defect, supply any omission or reconcile any inconsistency in the Plan or in any Award in the manner and to the extent it shall deem desirable to carry the Plan or any such Award into effect. The determinations of the Committee in the administration of the Plan, as described herein, shall be final and conclusive.

### The Compensation and Benefits Committee's Duties

61.     As alleged above, the Compensation and Benefits Committee was specifically responsible for administering the Employee Plan and the 1996 Plan. This duty was also specifically stated in Lehman Brothers' 2000 annual proxy which provides that the "[t]he Compensation Committee also establishes and administers all of the Company's employee benefit and compensation plans ...."

### The Board and its Committees Violated Lehman Brothers' Stock Option Plans

62.     Defendants' backdated stock options were granted below fair market value. Thus, the Compensation and Benefits Committee and the 1994 Committee—which consisted of undisclosed members of the Board—who had the authority and responsibility to approve the manipulated option grants violated Lehman Brothers' stock option plans. Further, defendants' backdating practices resulted in truncated stock-option vesting periods—a further violation of the plans. In turn, because the Plans were violated, the manipulated options granted under these plans must be cancelled and declared void.

63.     The Audit Committee also played a role.  According to Lehman Brothers' 2000 annual proxy, the Audit Committee "represents the Board in discharging its responsibilities relating to the accounting, reporting and financial control practices of the Company." These accounting and financial control practices included Lehman Brothers' adherence to SFAS No. 123, "Accounting for Stock-Based Compensation" and Accounting Principles Board Opinion No. 25 ("APB 25"). Under

SFAS No. 123 and APB 25, a compensation expense must be taken if options are not granted at fair market value. Because defendants' illegally manipulated options resulted in below fair market value grants, Lehman Brothers must now restate it prior financials to record stock option compensation expenses.

      64.      Accordingly, defendants Fuld, Kaufman, Berlind, Macomber, Ainslie, Akers, Cruikshank, Gent, Evans, Merrill and Kobayashi, who were directors on the Board or members of the Compensation and Audit Committees between 1995 and 2002 were directly responsible for the stock-option backdating improprieties. Thus, these defendants are also liable to Lehman Brothers in addition to the defendants who received backdated options. The following chart details the defendants who held positions on the Board, Compensation and Audit Committees when Lehman Brothers granted stock options that were suspiciously dated at or near monthly low stock prices or before significant appreciations in stock price:

| Suspicious Options Grant Date | Audit Committee Members | Compensation and Benefits Committee Members | Members of the Board |
|---|---|---|---|
| October 25, 1995 | Berlind, Macomber, Shimasaki | Macomber, Wilson | Berlind, Fuld, Kaufman, Macomber, Merrill, Wilson |
| March 18, 1996 | Berlind | Macomber, Merrill, Wilson | Akers, Berlind, Fuld, Kaufman, Macomber, Merrill, Wilson |
| December 14, 1998 | Ainslie, Berlind, Cruikshank, Kobayashi | Akers, Macomber, Merrill | Ainslie, Akers, Berlind, Cruikshank, Fuld, Kaufman, Kobayashi, Macomber, Merrill, |
| March 1, 1999 | Ainslie, Berlind, Cruikshank, Kobayashi | Akers, Macomber, Merrill | Ainslie, Akers, Berlind, Cruikshank, Fuld, Kaufman, Kobayashi, Macomber, Merrill |
| December 1, 2000 | Ainslie, Berlind, Cruikshank, Kobayashi | Akers, Macomber, Merrill | Ainslie, Akers, Berlind, Cruikshank, Fuld, Kaufman, Kobayashi, Macomber, Merrill |
| February 18, 2000 | Ainslie, Berlind, Cruikshank, Kobayashi | Akers, Macomber, Merrill | Ainslie, Akers, Berlind, Cruikshank, Fuld, Kaufman, Kobayashi, Macomber, Merrill |
| September 20, 2001 | Ainslie, Berlind, Cruikshank | Akers, Macomber, Merrill | Ainslie, Akers, Berlind, Cruikshank, Fuld, Kaufman, Macomber, Merrill |
| December 3, 2001 | Ainslie, Berlind, Cruikshank | Akers, Macomber, Merrill | Ainslie, Akers, Berlind, Cruikshank, Fuld, Kaufman, Macomber, Merrill |
| July 23, 2002 | Ainslie, Berlind, Cruikshank | Akers, Macomber, Merrill | Ainslie, Akers, Berlind, Cruikshank, Fuld, Kaufman, Macomber, Merrill |

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

65.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

66.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that Company insiders were improperly manipulating their stock option grants; (ii) conceal the fact that as a result of the improperly manipulated stock option grants, the Company's financial statements were inaccurate; (iii) maintain the Individual Defendants' executive and directorial positions at Lehman Brothers and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; (iv) deceive the shareholders of Lehman Brothers, regarding the level of compensation being paid to the Company's insiders and the Company's financial condition and future business prospects; and (v) artificially inflate the price of Lehman Brothers common stock so they could dispose of over $1.4 billion of their personally held stock. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

67.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct. During such time, the Individual Defendants caused the Company to conceal the true fact that Lehman Brothers was misrepresenting its financial results and that Lehman Brothers insiders were improperly manipulating their stock option grants.

68.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to grant themselves and other insiders undisclosed and unaccounted for compensation in the form of manipulated stock option grants and to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, insider trading, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment.

69.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

70.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## THE STOCK OPTION BACKDATING SCANDAL

71.    The traditional rationale behind the granting of stock options is to align a company's officers, directors and employees with the interests of the company. When an option is granted at or below full market value, that option is worthless until the grantee builds value in the option by building value in the company. Thus, the company and the insider both share in the value created. The backdating of options, however, subverts this principle because the instant paper gain of a backdated stock option only benefits the insider.

72.    On March 18, 2006, the *Wall Street Journal* published an article entitled: "The Perfect Payday: Some CEOs reap millions by landing stock options when they are most valuable. Luck – or something else?" The article stated in pertinent part:

On a summer day in 2002, shares of Affiliated Computer Services Inc. sank to their lowest level in a year. Oddly, that was good news for Chief Executive Jeffrey Rich.

His annual grant of stock options was dated that day, entitling him to buy stock at that price for years. Had they been dated a week later, when the stock was 27% higher, they'd have been far less rewarding. It was the same through much of Mr. Rich's tenure: In a striking pattern, all six of his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.

Just lucky? A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote -- around one in 300 billion. The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.

- 29 -

Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason: They were backdated. The SEC is understood to be looking at about a dozen companies' option grants with this in mind.

The Journal's analysis of grant dates and stock movements suggests the problem may be broader. It identified several companies with wildly improbable option-grant patterns. While this doesn't prove chicanery, it shows something very odd: Year after year, some companies' top executives received options on unusually propitious dates.

The analysis bolsters recent academic work suggesting that backdating was widespread, particularly from the start of the tech-stock boom in the 1990s through the Sarbanes-Oxley corporate reform act of 2002. If so, it was another way some executives enriched themselves during the boom at shareholders' expense. And because options grants are long-lived, some executives holding backdated grants from the late 1990s could still profit from them today.

\* \* \*

Stock options give recipients a right to buy company stock at a set price, called the exercise price or strike price. The right usually doesn't vest for a year or more, but then it continues for several years. The exercise price is usually the stock's 4 p.m. price on the date of the grant, an average of the day's high and low, or the 4 p.m. price the day before. Naturally, the lower it is, the more money the recipient can potentially make someday by exercising the options.

Which day's price the options carry makes a big difference. Suppose an executive gets 100,000 options on a day when the stock is at $30. Exercising them after it has reached $50 would bring a profit of $20 times 100,000, or $2 million. But if the grant date was a month earlier and the stock then was at, say, $20, the options would bring in an extra $1 million.

73.    Lynn Turner, former Chief Accountant of the SEC, has described stock option backdating as follows: "It's like allowing people to place bets on a horse race after the horses have crossed the finish line ...." In a recent article published by the *Wall Street Journal*, Arthur Levitt, a former chairman of the SEC was quoted as stating that stock-option backdating "represents the ultimate in greed." Further, Levitt stated: "It is stealing, in effect. It is ripping off shareholders in an unconscionable way." San Diego analyst Michael Cohen later made similar comments published by *Bloomberg*: "Stockholders are hit twice ... first you're stolen from, then the stock goes down when the theft is uncovered." Senator Chuck Grassley, Chairman of the Senate Finance Committee, concurs. He referred to stock-option backdating as "disgusting and repulsive." Grassley stated: "It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it

with a phrase that we hear all too often today, 'I'm going to get mine.' Even worse in this situation, most of the perpetrators had already gotten 'theirs' in the form of six and seven-figure compensation packages of which most working Americans can only dream."

74.    On May 5, 2006, President George W. Bush stated in an interview on the *Kudlow & Company* show airing on CNBC that "overcompensating or trying to backdate things is bad for America, and there ought to be consequences when people don't tell the truth and are not transparent."

75.    On July 20, 2006, the SEC announced it had filed civil charges against two former Brocade Communications Systems, Inc. executives for illegally manipulating stock-option grant dates. Criminal charges were brought simultaneously, indicating the serious view taken by governmental agencies with respect to improperly backdated options.

76.    In a news conference detailing the charges, SEC Chairman Christopher Cox proclaimed that "the full weight of the federal government is being put behind this effort to stamp out fraudulent stock-option backdating." He disclosed that additional cases likely would be brought in the "coming weeks and months." In later testimony before a Senate committee, Cox indicated that the SEC is currently investigating more than 100 companies, a large percentage of which are tech companies, meaning many more executives could face criminal charges related to manipulating options.

77.    Government disgust at stock-option backdating reached a new level on July 31, 2006, when the FBI issued an arrest warrant for Kobi Alexander ("Alexander")—former CEO of Comverse Technology, Inc. ("Comverse"). Alexander was charged with conspiracy related to backdated stock options. Not surprisingly, on August 9, 2006, he and fellow company cohorts David Kreinberg ("Kreinberg") (former CFO of Comverse) and William F. Sorin ("Sorin") (Comverse's former General Counsel) were criminally charged by the New York U.S. Attorney's Office for allegedly orchestrating a decade-old scheme to fraudulently backdate option grants and for operating a secret stock options slush fund. After transferring more than $57 million from the U.S. to accounts in the Middle East, Alexander fled the country.

78.    Emphasizing the importance that the U.S. government has placed on dealing with the backdating options scandal, Alexander was placed on the FBI's most wanted list.    On September 27, 2006, after an international manhunt, Alexander was captured in Namibia, and is expected to be extradited to the U.S. to stand trial with his alleged co-conspirators Kreinberg and Sorin.    On October 24, 2006, Kreinberg (Comverse's former CFO) pled guilty to securities fraud charges in federal court, and faces up to 15 years in prison.    He was reportedly the first person to plead guilty in the widening stock option backdating scandal.

79.    Also, on October 24, 2006, Kreinberg agreed to settle SEC charges for $2.4 million in disgorgement and interest and is permanently barred from serving as an officer or director of any company that has a class of securities registered pursuant to §12 of the Securities Exchange Act of 1934 (the "Exchange Act") or that is required to file reports pursuant to §15(d) of the Exchange Act. Shortly thereafter, on November 6, 2006, Sorin (Comverse's former General Counsel) pled guilty to a federal criminal conspiracy charge related to the backdating scheme at Comverse.    The charge carries a maximum penalty of five years in prison.    Kreinberg and Sorin are the first two executives succumbing to criminal charges in the widening backdating scandal, which now encompasses well over 100 companies under investigation by the SEC.

### DEFENDANTS' ILLEGAL OPTIONS MANIPULATING PRACTICES

80.    Dating back to at least 1995, the Individual Defendants have caused or allowed Lehman Brothers insiders to manipulate their stock option grant dates so as to illegally maximize their profits from the stock options.    Specifically, Company insiders cherry-picked their respective stock option grant dates to take advantage of lower exercise prices than the price on the actual grant date.    The price of Lehman Brothers shares on the reported option-grant date, therefore, was lower than the share price on the actual day the options were issued, thus providing defendants with more favorably priced options.    The Lehman Brothers Board, in turn, approved the grants of the options to Lehman Brothers insiders even though those options were improperly manipulated.

- 32 -

81.    The following charts identify the most egregious instances between 1995 and 2002 in

which options granted to certain defendants were purportedly dated at or very near the lowest share

price for the month, quarter or year in which they were granted:















82.    The following table provides an estimate as to the illegal paper profit that—the defendants identified in the prior charts—gained as a result of their stock option manipulations:

| Defendants | Reported Grant Date | Number of Securities Underlying Options | Price of Stock on Reported Date | Estimated Actual Exercise Price Range | | | Estimated Paper Profit Average |
|---|---|---|---|---|---|---|---|
| | | | | Low | | High | |
| Cecil | 10/25/1995 | 800,000 | $5.22 | $5.25 | - | $5.88 | $339,680.00 |
| Fuld | 10/25/1995 | 1,600,000 | $5.22 | $5.25 | - | $5.88 | $679,360.00 |
| Gregory | 10/25/1995 | 800,000 | $5.22 | $5.25 | - | $5.88 | $339,680.00 |
| Lessing | 10/25/1995 | 800,000 | $5.22 | $5.25 | - | $5.88 | $339,680.00 |
| Matza | 10/25/1995 | 400,000 | $5.22 | $5.25 | - | $5.88 | $169,840.00 |
| Russo | 10/25/1995 | 400,000 | $5.22 | $5.25 | - | $5.88 | $169,840.00 |
| Cecil | 12/14/1998 | 1,200,000 | $10.22 | $10.69 | - | $14.97 | $1,644,444.71 |
| Fuld | 12/14/1998 | 1,400,000 | $10.22 | $10.69 | - | $14.97 | $1,918,518.82 |
| Gregory | 12/14/1998 | 1,200,000 | $10.22 | $10.69 | - | $14.97 | $1,644,444.71 |
| Jack | 12/14/1998 | 1,200,000 | $10.22 | $10.69 | - | $14.97 | $1,644,444.71 |
| Lessing | 12/14/1998 | 1,200,000 | $10.22 | $10.69 | - | $14.97 | $1,644,444.71 |
| McKeever | 12/14/1998 | 1,200,000 | $10.22 | $10.69 | - | $14.97 | $1,644,444.71 |
| Vanderbeek | 12/14/1998 | 1,200,000 | $10.22 | $10.69 | - | $14.97 | $1,644,444.71 |
| Isaacs | 3/1/1999 | 300,000 | $13.25 | $13.95 | - | $15.64 | $382,425.00 |
| Fuld | 2/18/2000 | 1,600,000 | $15.81 | $15.97 | - | $22.86 | $5,873,617.78 |
| Gregory | 2/18/2000 | 1,200,000 | $15.81 | $15.97 | - | $22.86 | $4,405,213.33 |
| Isaacs | 2/18/2000 | 1,200,000 | $15.81 | $15.97 | - | $22.86 | $4,405,213.33 |
| Jack | 2/18/2000 | 1,200,000 | $15.81 | $15.97 | - | $22.86 | $4,405,213.33 |
| Lessing | 2/18/2000 | 1,200,000 | $15.81 | $15.97 | - | $22.86 | $4,405,213.33 |
| McKeever | 2/18/2000 | 1,200,000 | $15.81 | $15.97 | - | $22.86 | $4,405,213.33 |
| Vanderbeek | 2/18/2000 | 1,200,000 | $15.81 | $15.97 | - | $22.86 | $4,405,213.33 |
| Goldfarb | 9/20/2001 | 150,000 | $23.32 | $23.75 | - | $31.51 | $841,159.09 |
| Russo | 9/20/2001 | 150,000 | $23.32 | $23.75 | - | $31.51 | $841,159.09 |
| Fuld | 12/3/2001 | 800,000 | $31.70 | $32.31 | - | $34.76 | $1,610,666.67 |
| Goldfarb | 12/3/2001 | 150,000 | $31.70 | $32.31 | - | $34.76 | $302,000.00 |
| Gregory | 12/3/2001 | 600,000 | $31.70 | $32.31 | - | $34.76 | $1,208,000.00 |
| Isaacs | 12/3/2001 | 600,000 | $31.70 | $32.31 | - | $34.76 | $1,208,000.00 |
| Isaacs | 12/3/2001 | 1,000,000 | $31.70 | $32.31 | - | $34.76 | $2,013,333.33 |
| Jack | 12/3/2001 | 600,000 | $31.70 | $32.31 | - | $34.76 | $1,208,000.00 |
| Vanderbeek | 12/3/2001 | 600,000 | $31.70 | $32.31 | - | $34.76 | $1,208,000.00 |
| Goldfarb | 7/23/2002 | 1,000,000 | $25.31 | $26.60 | - | $30.97 | $3,020,526.32 |
| Total | | 28,150,000 | | | | | $59,971,434.33 |

83.    The following charts compare the returns on stock options realized by defendants to the returns realized by average Lehman Brothers investors for suspicious and non-suspicious grants during the period beginning 1995 through 2007. The "Defendant Option Grant Date" column lists the various dates on which Lehman Brothers insiders were granted suspiciously dated stock options. The "Defendant 20-Day Return" column shows the return realized by Lehman Brothers insiders in

the twenty days following the option grant date. This amount is compared to the "Investor Average 20-Day Return" column, which lists the average return realized by average Lehman Brothers investors over a typical twenty-day period in the year of the grant date. The percentage difference between these two returns is shown in the "Defendant Excess Return" column. A May 22, 2006 report by Merrill Lynch entitled *Options Pricing - Hindsight is 20/20* stated: "Theoretically, companies should not be generating any systematic excess return in comparison to other investors as a result of how options pricing events are timed." Conversely, suspiciously dated option grants by Lehman Brothers did generate large excess returns in comparison to grants not suspiciously dated, thereby strongly suggesting the occurrence of grant date manipulation.

### Suspicious Grants[1]

| Defendant Option Grant Date | Defendant 20-Day Return | Investor Average 20-Day Return | Defendant Excess Return |
|---|---|---|---|
| 10/25/1995 | 9.0% | 2.4% | 6.6% |
| 3/18/1996 | 8.3% | 2.6% | 5.7% |
| 12/14/1998 | 27.2% | -0.7% | 28.0% |
| 3/1/1999 | 11.1% | 5.0% | 6.0% |
| 2/18/2000 | 44.6% | 3.3% | 41.3% |
| 12/1/2000 | 32.3% | 3.3% | 29.0% |
| 9/20/2001 | 30.4% | -0.1% | 30.4% |
| 12/3/2001 | 5.4% | -0.1% | 5.4% |
| 7/23/2002 | 22.4% | -1.1% | 23.5% |
| Average: | 21.2% | 1.7% | 19.5% |

### Non-Suspicious Grants

| Insider Option Grant Date | Insider 20-Day Return | Investor Average 20-Day Return | Insider Excess Return |
|---|---|---|---|
| 5/30/1996 | 1.0% | 2.6% | -1.6% |
| 1/8/1997 | 4.6% | 3.4% | 1.1% |
| 12/11/1997 | 4.9% | 3.4% | 1.5% |
| 3/31/1998 | -6.8% | -0.7% | -6.0% |
| 3/30/1999 | 0.6% | 5.0% | -4.4% |

---

[1] All of the values displayed in this chart are rounded to one decimal place.

| 12/1/1999 | 10.6% | 5.0% | 5.5% |
|---|---|---|---|
| 4/4/2000 | -7.1% | 3.3% | -10.4% |
| 4/3/2001 | 27.8% | -0.1% | 27.9% |
| 4/9/2002 | -4.6% | -1.1% | -3.5% |
| 12/11/2002 | 7.2% | -1.1% | 8.3% |
| 4/8/2003 | 6.8% | 2.5% | 4.3% |
| 12/10/2003 | 11.9% | 2.5% | 9.4% |
| 4/2/2004 | -11.2% | 0.7% | -11.9% |
| 12/9/2004 | 2.8% | 0.7% | 2.0% |
| 4/5/2005 | -5.2% | 2.5% | -7.7% |
| 12/9/2005 | 2.9% | 2.5% | 0.4% |
| 4/5/2006 | -3.4% | 1.2% | -4.6% |
| 4/12/2007 | 7.8% | 0.0% | 7.9% |
| **Average:** | **2.8%** | **1.8%** | **1.0%** |

84.    Plaintiff's analysis identified a total of 27 option grants by Lehman Brothers from 1995 to present. Plaintiff concluded that a total of nine of these grants appeared to be subject to grant date manipulation. The table below ranks the nine manipulated grants according to the grant price selected for the month; *i.e.*, a "1" ranking indicates an option grant set at the lowest closing share price for that month. The table also sets forth the percentage returns for Lehman Brothers stock during the twenty days after the grant date. As shown below, the twenty-day stock return for the nine manipulated option grants averaged over 20 percent—suggesting that the grants were manipulated because the recipients made substantial gains.

85.    The other 18 grant dates were followed by an average twenty-day stock return of less than three percent, suggesting that it is unlikely that these were subject to manipulation. Of the manipulated grants, seven were granted on the lowest day of their respective months. Plaintiff used an algorithm based upon the work of Professor Erik Lie, an expert on options backdating, to calculate the probability that the nine manipulated grants would have occurred by chance. That probability is 0.0097 percent or *less than one in ten thousand*.

| Grant Dates | Monthly Rank | 20-Day Return |
|---|---|---|
| Grants likely subject to grant date manipulation | | |
| 10/25/1995 | 1 | 9.0% |
| 12/14/1998 | 1 | 27.2% |
| 3/1/1999 | 1 | 11.1% |
| 12/1/2000 | 1 | 32.3% |

| | | |
|---|---|---|
| 9/20/2001 | 1 | 30.4% |
| 12/3/2001 | 1 | 5.4% |
| 7/23/2002 | 1 | 22.4% |
| 2/18/2000 | 2 | 44.6% |
| 3/18/1996 | 8 | 8.3% |
| | **Average:** | **21.2%** |

| Grant Dates | Monthly Rank | 20-Day Return |
|---|---|---|
| Grants unlikely to be subject to grant date manipulation | | |
| 12/1/1999 | 1 | 10.6% |
| 12/10/2003 | 1 | 11.9% |
| 1/8/1997 | 2 | 4.6% |
| 4/3/2001 | 2 | 27.8% |
| 5/30/1996 | 4 | 1.0% |
| 12/11/1997 | 4 | 4.9% |
| 4/5/2006 | 4 | -3.4% |
| 12/11/2002 | 5 | 7.2% |
| 4/8/2003 | 5 | 6.8% |
| 4/12/2007 | 6 | 7.8% |
| 12/9/2005 | 7 | 2.9% |
| 12/9/2004 | 9 | 2.8% |
| 4/4/2000 | 11 | -7.1% |
| 4/5/2005 | 13 | -5.2% |
| 4/9/2002 | 14 | -4.6% |
| 3/30/1999 | 16 | 0.6% |
| 4/2/2004 | 20 | -11.2% |
| 3/31/1998 | 22 | -6.8% |
| | **Average:** | **2.8%** |

## DEFENDANTS' ILLEGAL SPRINGLOADING OPTIONS MANIPULATIONS

86.    Springloading is a type of stock option manipulation that involves the illegal misappropriation of inside information to time option grants before a significant increase in the Company's shares. Similar to backdating, springloading brings an immediate profit to the option holders.

87.    On March 18, 1996, defendants purportedly granted 5.3 million options to defendants Fuld, Cecil, Lessing, Gregory, Callaghan and Russo. Two days later, Lehman Brothers announced a 131% increase in net profit for the first quarter of the Company's fiscal 1996. This positive news precipitated an 11% increase in the Company's stock price over the following three weeks. In other

words, Fuld, Cecil, Lessing, Gregory, Callaghan and Russo's options were now worth more than $3.8 million. This option grant is illustrated by the following chart:



88.    On December 1, 2000, defendants purportedly granted 4.7 million options to defendants Fuld, Vanderbeek, Gregory, Lessing, Issacs Goldfarb, Jack and Russo. On the next day, Lehman Brothers announced an agreement with Lone Star Fund III to buy $638 million worth of bad loans from Korea's Chohung Bank at more than half of face value. This positive news precipitated an 21% increase in the Company's stock price over the following three weeks. In other words, Fuld, Vanderbeek, Gregory, Lessing, Issacs, Goldfarb, Jack and Russo's options were now worth more than $22.5 million. This option grant is illustrated by the following chart:



89. The manipulated options grants described in the preceding paragraphs involved the misappropriation of the positive material information concerning Lehman Brothers' financial results and business prospects. Further, defendants issued the springloaded options with the intent to circumvent Lehman Brothers' stock option plans, which required that Lehman Brothers options be granted at fair market value. Defendants authorized the springloaded grants at times at which they knew the options were worth more than the exercise price due to the unannounced positive material information. Accordingly, defendants' approval, authorization and/or receipt of springloaded options were breaches of their fiduciary duties of loyalty and good faith.

90. Further, defendants' springloading practices are equivalent to insider trading in that they utilized material, non-public information to benefit themselves in breach of their fiduciary duties owed to Lehman Brothers.

## IMPROPER FINANCIAL REPORTING RELATING TO DEFENDANTS' STOCK OPTION MANIPULATIONS

91. Between 1995 and the present, the Individual Defendants caused or allowed Lehman Brothers to file proxies, Form 10-Qs, Form 10-Ks and other filings that presented the Company's

financial results in violation of Generally Accepted Accounting Principles ("GAAP"), due to improper accounting for manipulated stock option grants.    Specifically, Lehman Brothers' compensation expenses were understated and its net earnings were overstated.

92.    Further, defendants have caused or allowed Lehman Brothers: (i) to file materially false and misleading financial statements that materially understated its compensation expenses and materially overstated its quarterly and annual net income and earnings per share; and (ii) to make disclosures in its periodic filings and proxy statements that falsely portrayed Lehman Brothers' options as having been granted at exercise prices equal to the fair market value of Lehman Brothers' common stock on the date of the grant.    Under GAAP, the instant paper gain received from backdated stock options was equivalent to paying extra compensation and should have been recorded as a cost to Lehman Brothers.    These costs were also not properly recorded.    In turn, since these costs were not properly recorded, Lehman Brothers' profits were overstated.

93.    Specifically, since 1995, the Individual Defendants have caused or allowed Lehman Brothers to report improper financial results—materially overstating its earnings—as follows:

| Fiscal Year (Ending November 30) | Reported Earnings (in milliions) | Reported Shares (in millions) | Reported Diluted EPS |
|---|---|---|---|
| 1995 | $200 | 454.03 | $0.44 |
| 1996 | $378 | 466.67 | $0.81 |
| 1997 | $572 | 484.75 | $1.18 |
| 1998 | $649 | 499.23 | $1.30 |
| 1999 | $1,037 | 508.33 | $2.04 |
| 2000 | $1,679 | 528.40 | $3.19 |
| 2001 | $1,161 | 530.60 | $2.19 |
| 2002 | $906 | 522.30 | $1.73 |
| 2003 | $1,649 | 519.70 | $3.17 |
| 2004 | $2,297 | 581.50 | $3.95 |
| 2005 | $3,191 | 587.20 | $5.43 |
| 2006 | $3,941 | 578.40 | $6.81 |

94.    In addition to breaches of fiduciary duty and accounting issues, the manipulation of stock options can have severe tax consequences.    While stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not qualify for that treatment.    In effect, backdating allows these "in-the-money" options to appear in regulatory filings as if they were

- 43 -

ordinary grants. For example, for performance-based stock options (generally granted to the five highest-paid executives), a company is allowed to take a tax deduction on that full amount *provided that the options were granted at the market price*. Backdating and other stock options manipulations, however, automatically disqualifies those options from receiving the tax break— instead, a company's tax deduction would be capped at $1 million for each of the top five executives.

95.    In light of these serious potential tax-related ramifications, the IRS is now examining as many as 40 companies, which are being investigated for manipulating stock options, to determine whether they owe millions of dollars in unpaid taxes. On July 28, 2006, the *New York Times* published an article entitled "I.R.S. Reviewing Companies in Options Inquiries," which stated:

> The Internal Revenue Service is examining as many as 40 companies ensnared in various stock options investigations to determine whether they owe millions of dollars in unpaid taxes.
>
> In the last few weeks, the agency has directed its corporate auditors to start reviewing the tax returns of dozens of executives and companies, which may have improperly reported stock option grants. These preliminary investigations are expected to take months, but if there is early evidence of widespread tax trouble, I.R.S. officials said they were prepared to step up their effort.
>
> "Where there are indications of mischief, we want to now look at those cases and see if they complied with tax laws," said Bruce Ungar, the agency's deputy commissioner for large and midsize businesses. "It is possible that they are compliant, but the early indication is that there is a good likelihood there is some noncompliance.
>
> "If this is a big problem, we will apply more resources," he added.
>
> The I.R.S. auditors are focusing on the potential tax obligations from backdated stock options that have been cashed out since 2002. Federal rules bar the I.R.S. from opening cases that are more than three years old. Still, tax lawyers estimate the agency could reap hundreds of millions of dollars from civil penalties, unpaid taxes and interest payments if widespread wrongdoing is found.
>
> The agency appears to be taking aim both at companies that took improper tax deductions, and at executives who received favorable tax treatment and might have misreported income.
>
> So far, rank-and-file employees who simply received potentially backdated stock options are not in the agency's cross hairs.
>
> "If you were involved in the mischief, you would want to be worried," Mr. Ungar said. "If you weren't involved in it, then you are not in the same situation."
>
> The tax scrutiny is the latest twist in what is perhaps the biggest financial scandal of the year and comes as the agency cracks down on misreported executive

pay. The I.R.S. follows several other federal agencies that have begun investigations into the myriad problems that arise from improperly reported or backdated stock option grants.

The Securities and Exchange Commission has said it is examining 80 companies for potential accounting and disclosure problems. On Wednesday, it underlined that focus with new rules on reporting executive compensation. The Justice Department has issued subpoenas to at least 35 companies and last week brought its first criminal charges, against two former executives of Brocade Communications. Now, tax troubles may be next.

By itself, backdating stock option grants is not necessarily illegal. But it can have severe tax consequences separate from potential accounting violations. While ordinary stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not. Backdating effectively allows such in-the-money options to appear in regulatory filings as if they were ordinary grants.

The I.R.S. is broadly focused on two main areas that may have been abused: performance-based stock options for top executives and incentive stock options that were frequently handed out to the rank and file. Each receives a different type of tax treatment.

Performance-based stock options are generally granted to the five highest-paid executives and can often be worth tens, if not hundreds of millions of dollars when they are cashed out. So long as the options meet certain standards, such as being granted at the market price, companies are allowed to take a tax deduction on that full amount.

But backdating — effectively granting stock options with a discount — automatically disqualifies those options from receiving the tax break. Instead, a company's tax deduction would be capped at $1 million for each of the top five executives.

"If these companies have been deducting huge option grants that they actually couldn't deduct, that seems like a big pile of money out there," said Larry R. Langdon, a tax lawyer in Palo Alto, Calif., and a former I.R.S. commissioner.

Improperly awarded incentive stock options could lead to even more tax trouble. Backdating, which grants a discounted option, effectively voids the favorable tax treatment that incentive stock options provide employees, rendering their individual tax returns inaccurate. Companies, meanwhile, could be faulted for underreporting their payroll tax.

"Maybe it is not a widespread problem, but if this happened to five employees, you have five nightmares," said Fred Whittlesey, an executive pay consultant and head of the Compensation Venture Group. "Employees will have a legal and companies will have an ethical responsibility to insulate them from what happened based on actions of a few people."

The I.R.S. assembled a five-member task force to oversee its examinations about two months ago. And in the last few weeks, the Internal Revenue commissioner, Mark W. Everson, directed the agency's corporate auditors to look into potential tax issues as dozens of companies have come forward. In a statement,

he called on them to "consult closely with the S.E.C. to determine which companies merit scrutiny."

Last week, I.R.S. officials held their first meeting with Linda Chatman Thomsen, the director of the S.E.C.'s enforcement division. She indicated that there were tax issues in the cases that securities regulators were investigating, Mr. Ungar said.

For now, I.R.S. officials are reviewing the files of 30 to 40 of the companies that have publicly disclosed problems, including some already facing scrutiny on other tax issues. Mr. Ungar said it could take months to more than a year before these initial cases are resolved. Much of the information will need to be supplied by the companies themselves, not taken from tax returns. I.R.S. officials have not yet been in touch with the Justice Department about potential tax fraud.

96.    Lehman Brothers is or will be added to the list of companies currently being investigated by the IRS because of defendants' rampant options manipulation practices and the millions of dollars worth of improper deductions taken by the Company.

## THE INDIVIDUAL DEFENDANTS CERTIFICATION OF IMPROPER FINANCIALS

97.    Lehman Brothers' 1995 through 2006 Forms 10-Q and Forms 10-K were reviewed, prepared and/or endorsed by the Individual Defendants. Specifically, the following chart details the defendants and other individuals who signed filings before the enactment of the SOX:

| Date | Filing | Person(s) Who Signed and Certified |
|---|---|---|
| 4/13/1995 | 10-Q | Richard S. Fuld, Jr. (Chairman of the Board and Chief Executive Officer); Robert Matza (Chief Financial Officer) |
| 7/11/1995 | 10-Q/A | Richard S. Fuld, Jr. (Chairman of the Board and Chief Executive Officer); Robert Matza (Chief Financial Officer) |
| 7/14/1995 | 10-Q | Richard S. Fuld, Jr. (Chairman of the Board and Chief Executive Officer); Robert Matza (Chief Financial Officer) |
| 10/16/1995 | 10-Q | Richard S. Fuld, Jr. (Chairman of the Board and Chief Executive Officer); Robert Matza (Chief Financial Officer) |
| 2/28/1996 | 10-K | Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board); Robert Matza (Chief Financial Officer); David Goldfarb (Controller); John F. Akers (Director); Roger S. Berlind (Director); Henry Kaufman (Director); John D. Macomber (Director); Dina Merrill (Director); Malcolm Wilson (Director); Karen M. Muller (Vice President) |
| 4/15/1996 | 10-Q | Richard S. Fuld, Jr. (Chairman of the Board and Chief Executive Officer); Charles B. Hintz (Chief Financial Officer) |
| 7/15/1996 | 10-Q | Richard S. Fuld, Jr. (Chairman of the Board and Chief Executive Officer); Charles B. Hintz (Chief Financial Officer) |
| 10/15/1996 | 10-Q | Richard S. Fuld, Jr. (Chairman of the Board and Chief Executive Officer); Charles B. Hintz (Chief Financial Officer) |

| | | |
|---|---|---|
| 2/28/1997 | 10-K405 | Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board); Charles B. Hintz (Chief Financial Officer); Michael L. Ainslie (Director); John F. Akers (Director); Roger S. Berlind (Director); Thomas H. Cruikshank (Director); Katsumi Funaki (Director); Henry Kaufman (Director); John D. Macomber (Director); Dina Merrill (Director); Karen M. Muller (Vice President) |
| 4/14/1997 | 10-Q | Richard S. Fuld, Jr. (Chairman of the Board and Chief Executive Officer); Charles B. Hintz (Chief Financial Officer) |
| 7/15/1997 | 10-Q | Richard S. Fuld, Jr. (Chairman of the Board and Chief Executive Officer); Charles B. Hintz (Chief Financial Officer) |
| 10/15/1997 | 10-Q | Richard S. Fuld, Jr. (Chairman of the Board and Chief Executive Officer); Charles B. Hintz (Chief Financial Officer) |
| 2/27/1998 | 10-K405 | Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board); Charles B. Hintz (Chief Financial Officer); Michael L. Ainslie (Director); John F. Akers (Director); Roger S. Berlind (Director); Thomas H. Cruikshank (Director); Henry Kaufman (Director); Hideichiro Kobayashi (Director); John D. Macomber (Director); Dina Merrill (Director); Karen M. Muller (Vice President) |
| 4/14/1998 | 10-Q | Richard S. Fuld, Jr. (Chairman of the Board and Chief Executive Officer); Charles B. Hintz (Chief Financial Officer) |
| 5/12/1998 | 10-Q/A | Jennifer Marre (Vice President); Charles B. Hintz (Chief Financial Officer) |
| 7/15/1998 | 10-Q | Richard S. Fuld, Jr. (Chairman of the Board and Chief Executive Officer); Charles B. Hintz (Chief Financial Officer) |
| 10/15/1998 | 10-Q | John Cecil (Chief Financial and Administrative Officer) |
| 2/26/1999 | 10-K405 | Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board); John L. Cecil (Chief Financial Officer and Administrative Officer); Michael L. Ainslie (Director); John F. Akers (Director); Roger S. Berlind (Director); Thomas H. Cruikshank (Director); Henry Kaufman (Director); Hideichiro Kobayashi; John D. Macomber (Director); Dina Merrill (Director); Karem M. Muller (Vice President) |
| 3/5/1999 | 10-K405/A | Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board); John L. Cecil (Chief Financial Officer and Administrative Officer); Michael L. Ainslie (Director); John F. Akers (Director); Roger S. Berlind (Director); Thomas H. Cruikshank (Director); Henry Kaufman (Director); Hideichiro Kobayashi; John D. Macomber (Director); Dina Merrill (Director); Karem M. Muller (Vice President) |
| 4/14/1999 | 10-Q | John Cecil (Chief Financial and Administrative Officer) |
| 7/15/1999 | 10-Q | John Cecil (Chief Financial and Administrative Officer) |
| 10/14/1999 | 10-Q | John Cecil (Chief Financial and Administrative Officer) |
| 2/28/2000 | 10-K | Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board of Directors); John L. Cecil (Chief Financial and Administrative Officer); Michael L. Ainslie (Director); John F. Akers (Director); Roger S. Berlind (Director); Thomas H. Cruikshank (Director); Henry Kaufman (Director); Hideichiro Kobayashi (Director); John D. Macomber (Director); Dina Merrill (Director); Jennifer Marre (Vice President) |
| 4/14/2000 | 10-Q | David Goldfarb (Chief Accounting Officer) |
| 7/17/2000 | 10-Q | David Goldfarb (Chief Financial Officer) |
| 10/16/2000 | 10-Q | David Goldfarb (Chief Financial Officer) |

| Date | Filing | |
|---|---|---|
| 2/28/2001 | 10-K405 | Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board of Directors); David Goldfarb (Chief Financial Officer and Senior Vice President); Michael L. Ainslie (Director); John F. Akers (Director); Roger S. Berlind (Director); Thomas H. Cruikshank (Director); Henry Kaufman (Director); John D. Macomber (Director); Dina Merrill (Director); Jeffrey A. Welikson (Vice President) |
| 3/9/2001 | 10-K/A | Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board of Directors); David Goldfarb (Chief Financial Officer and Senior Vice President); Michael L. Ainslie (Director); John F. Akers (Director); Roger S. Berlind (Director); Thomas H. Cruikshank (Director); Henry Kaufman (Director); John D. Macomber (Director); Dina Merrill (Director); Jeffrey A. Welikson (Vice President) |
| 4/16/2001 | 10-Q | David Goldfarb (Chief Financial Officer and Senior Vice President) |
| 7/16/2001 | 10-Q | David Goldfarb (Chief Financial Officer and Senior Vice President) |
| 10/15/2001 | 10-Q | David Goldfarb (Chief Financial Officer) |
| 2/28/2002 | 10-K405 | Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board of Directors); David Goldfarb (Chief Financial Officer and Senior Vice President); Michael L. Ainslie (Director); John F. Akers (Director); Roger S. Berlind (Director); Thomas H. Cruikshank (Director); Henry Kaufman (Director); John D. Macomber (Director); Dina Merrill (Director) |
| 4/15/2002 | 10-Q | David Goldfarb (Chief Financial Officer) |
| 7/15/2002 | 10-Q | David Goldfarb (Chief Financial Officer) |

98.    The following chart details the defendants who made certifications of Lehman

Brothers filings under SOX after its enactment:

| Date | Filing | Person(s) Who Signed and Certified |
|---|---|---|
| 10/15/2002 | 10-Q | David Goldfarb (Chief Financial Officer and Executive Vice President) **SOX Certification:** Richard S. Fuld, Jr. (CEO); David Goldfarb (CFO) |
| 2/28/2003 | 10-K | Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board of Directors); David Goldfarb (Chief Financial Officer and Executive Vice President); Michael L. Ainslie (Director); John F. Akers (Director); Roger S. Berlind (Director); Thomas H. Cruikshank (Director); Henry Kaufman (Director); John D. Macomber (Director); Dina Merrill (Director) **SOX Certification:** Richard S. Fuld, Jr. (CEO); David Goldfarb (CFO) |
| 4/14/2003 | 10-Q | David Goldfarb (Chief Financial Officer and Executive Vice President) **SOX Certification:** Richard S. Fuld, Jr. (CEO); David Goldfarb (CFO) |
| 7/15/2003 | 10-Q | David Goldfarb (Chief Financial Officer and Executive Vice President) **SOX Certification:** Richard S. Fuld, Jr. (CEO); David Goldfarb (CFO) |
| 10/15/2003 | 10-Q | David Goldfarb (Chief Financial Officer and Executive Vice President) **SOX Certification:** Richard S. Fuld, Jr. (CEO); David Goldfarb (CFO) |

| | | |
|---|---|---|
| 2/26/2004 | 10-K | Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board of Directors); David Goldfarb (Chief Financial Officer and Executive Vice President); Michael L. Ainslie (Director); John F. Akers (Director); Roger S. Berlind (Director); Thomas H. Cruikshank (Director); Christopher Gent (Director); Henry Kaufman (Director); John D. Macomber (Director); Dina Merrill (Director) **SOX Certification:** Richard S. Fuld, Jr. (CEO); David Goldfarb (CFO) |
| 4/14/2004 | 10-Q | Christopher M. O'Meara (Vice President and Controller) **SOX Certification:** Richard S. Fuld, Jr. (CEO); David Goldfarb (CFO) |
| 7/14/2004 | 10-Q | Christopher M. O'Meara (Vice President and Controller) **SOX Certification:** Richard S. Fuld, Jr. (CEO); David Goldfarb (CFO) |
| 10/15/2004 | 10-Q | Christopher M. O'Meara (Vice President and Controller) **SOX Certification:** Richard S. Fuld, Jr. (CEO); David Goldfarb (CFO) |
| 2/14/2005 | 10-K | Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board of Directors); Christopher M. O'Meara (Chief Financial Officer, Controller and Executive Vice President); Michael L. Ainslie (Director); John F. Akers (Director); Roger S. Berlind (Director); Thomas H. Cruikshank (Director); Marsha Johnson Evans (Director); Christopher Gent (Director); Henry Kaufman (Director); John D. Macomber (Director); Dina Merrill (Director) **SOX Certification:** Richard S. Fuld, Jr. (CEO); Christopher O'Meara (Director) |
| 2/16/2005 | 10-K/A | Jeffrey A. Welikson (Vice President and Secretary); Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board of Directors); Christopher M. O'Meara (Chief Financial Officer, Controller and Executive Vice President); Michael L. Ainslie (Director); John F. Akers (Director); Roger S. Berlind (Director); Thomas H. Cruikshank (Director); Marsha Johnson Evans (Director); Christopher Gent (Director); Henry Kaufman (Director); John D. Macomber (Director); Dina Merrill (Director) **SOX Certification:** Richard S. Fuld, Jr. (CEO); Christopher M. O'Meara (CFO) |
| 4/11/2005 | 10-Q | Christopher M. O'Meara (Chief Financial Officer, Controller and Executive Vice President) **SOX Certification:** Richard S. Fuld, Jr. (CEO); Christopher M. O'Meara (CFO) |
| 7/11/2005 | 10-Q | Christopher M. O'Meara (Chief Financial Officer, Controller and Executive Vice President) **SOX Certification:** Richard S. Fuld, Jr. (CEO); Christopher M. O'Meara (CFO) |
| 10/11/2005 | 10-Q | Christopher M. O'Meara (Chief Financial Officer, Controller and Executive Vice President) **SOX Certification:** Richard S. Fuld, Jr. (CEO); Christopher M. O'Meara (CFO) |
| 2/13/2006 | 10-K | Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board of Directors); Christopher M. O'Meara (Chief Financial Officer, Controller and Executive Vice President); Michael L. Ainslie (Director); John F. Akers (Director); Roger S. Berlind (Director); Thomas H. Cruikshank (Director); Marsha Johnson Evans (Director); Christopher Gent (Director); Henry Kaufman (Director); John D. Macomber (Director); Dina Merrill (Director) **SOX Certification:** Richard S. Fuld Jr. (CEO); Christopher M. O'Meara (CFO) |

| | | |
|---|---|---|
| 4/10/2006 | 10-Q | Christopher M. O'Meara (Chief Financial Officer, Controller and Executive Vice President) **SOX Certification:** Richard S. Fuld, Jr. (CEO); Christopher M. O'Meara (CFO) |
| 7/10/2006 | 10-Q | Christopher M. O'Meara (Chief Financial Officer, Controller and Executive Vice President) **SOX Certification:** Richard S. Fuld, Jr. (CEO); Christopher M. O'Meara (CFO) |
| 10/10/2006 | 10-Q | Christopher M. O'Meara (Chief Financial Officer, Controller and Executive Vice President) **SOX Certification:** Richard S. Fuld, Jr. (CEO); Christopher M. O'Meara (CFO) |
| 2/13/2007 | 10-K | Richard S. Fuld, Jr. (Chief Executive Officer and Chairman of the Board of Directors); Christopher M. O'Meara (Chief Financial Officer, Controller and Executive Vice President); Michael L. Ainslie (Director); John F. Akers (Director); Roger S. Berlind (Director); Thomas H. Cruikshank (Director); Marsha Johnson Evans (Director); Christopher Gent (Director); Henry Kaufman (Director); John D. Macomber (Director) **SOX Certification:** Richard S. Fuld Jr. (CEO); Christopher M. O'Meara (CFO) |
| 4/9/2007 | 10-Q | Christopher M. O'Meara (Chief Financial Officer, Controller and Executive Vice President) **SOX Certification:** Richard S. Fuld, Jr. (CEO); Christopher M. O'Meara (CFO) |

99.    The SOX certifications signed in conjunction with the filing of Lehman Brothers' Form 10-Ks and 10-Qs contained language that was substantially similar or identical to the following certification attached to Lehman Brothers' fiscal 2003 Form 10-K that was signed by defendants Fuld and Goldfarb:

I, [Richard S. Fuld, Jr./David Goldfarb], certify that:

1.    I have reviewed this annual report on Form 10-K of Lehman Brothers Holdings Inc.;

2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

    a)    designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)   evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c)   presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a)   all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.   The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

## ILLEGAL INSIDER SELLING

100.   While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Lehman Brothers stock that they had obtained, often by cashing in manipulated stock options:

| Defendant | Start Date | End Date | Shares | Proceeds |
|-----------|-----------|----------|--------|----------|
| CECIL | 5/19/1998 | 7/1/1999 | 365,520 | $24,713,658.26 |
| FULD | 4/3/1997 | 11/30/2006 | 5,884,237 | $498,458,024.39 |
| GOLDFARB | 6/30/2000 | 3/17/2006 | 673,418 | $64,765,987.50 |
| GREGORY | 6/19/1998 | 11/30/2006 | 4,709,080 | $387,149,371.48 |
| HINTZ | 6/29/1998 | 6/29/1998 | 39,200 | $3,044,764.24 |
| ISAACS | 5/8/2001 | 10/29/2002 | 440,000 | $29,366,275 |
| JACK | 6/25/1998 | 8/24/2004 | 2,322,431 | $157,246,370.08 |
| KAUFMAN | 6/19/2006 | 6/19/2006 | 25,000 | $1,547,158 |
| LESSING | 6/30/1999 | 1/11/2001 | 764,820 | $60,262,833.01 |
| MCKEEVER | 6/19/1998 | 7/1/2000 | 398,681 | $32,260,672.67 |
| O'MEARA | 11/30/2004 | 11/30/2006 | 19,642 | $2,310,832.12 |
| RUSSO | 5/13/1998 | 11/30/2006 | 1,037,463 | $93,526,736.73 |
| VANDERBEEK | 6/19/1998 | 11/20/2002 | 1,410,792 | $96,339,164.48 |
| | | | 18,090,284 | $1,450,991,847.96 |

### THE IMPROPER BUYBACKS

101.    At the same time that the Insider selling defendants were selling over $1.4 billion of their personally held shares at inflated prices, they were directing the Company to buyback over $14.4 billion shares. Specifically, the Individual Defendants directed the following buybacks:

### VALUE OF SHARES REPURCHASED

| Year | Dollar Value |
|------|--------------|
| 1997 | $77   million |
| 1998 | $469  million |
| 1999 | $1.2  billion |
| 2000 | $1.6  billion |
| 2001 | $1.5  billion |
| 2002 | $1.5  billion |
| 2003 | $2.2  billion |
| 2004 | $353  million |
| 2005 | $2.9  billion |
| 2006 | $2.6  billion |

### DAMAGES TO LEHMAN BROTHERS

102.    As a result of the defendants' improprieties, the Company has and will need to expend significant sums of money including the following:

(a)    Costs incurred from increased Directors' & Officers' Insurance premiums as a result of the illegally manipulated stock option grants;

(b)    Enormous tax liabilities from improper deductions taken on backdated option grants;

(c)    Costs of potential liability to employees whose stock options will be cancelled due to stock options manipulation issues;

(d)    Costs incurred with paying taxes on behalf of rank and file employees and former employees who inadvertently exercised manipulated option grants;

(e)    Costs incurred from the Company's reduced ability to borrow funds or raise capital as a result of potential ratings downgrades;

(f)    Costs incurred from severance paid to employees who have resigned or have been terminated and costs incurred to hire persons to replace those employees;

(g)     Costs incurred from directing manpower to correct Lehman Brothers' defective internal controls; and

(h)     Costs incurred from directing manpower to potentially restate Lehman Brothers' prior financial results to correct for the improperly dated stock option grants.

103.    Moreover, between 1997 and 2005, the Individual Defendants caused Lehman Brothers to repurchase $14.2 billion worth of its own stock on the open market at inflated prices

104.    A recent study from the University of Michigan's Ross School of Business indicates that the fallout from a company's implication in the backdating scandal can result in a company's market value dropping an average of 7%. A similar 7% fall in Lehman Brothers' market value would result in a decline of over $2.8 billion.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

105.    Plaintiff brings this action derivatively in the right and for the benefit of Lehman Brothers to redress injuries suffered, and to be suffered, by Lehman Brothers as a direct result of the violations of SOX and the Exchange Act, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Lehman Brothers is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

106.    Plaintiff will adequately and fairly represent the interests of Lehman Brothers in enforcing and prosecuting its rights.

107.    Plaintiff is and was an owner of the stock of Lehman Brothers during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

108.    The Board of Lehman Brothers currently consists of the following ten individuals: defendants Fuld, Kaufman, Berlind, Macomber, Ainslie, Akers, Cruikshank, Gent, Evans and Roland A. Hernandez ("Hernandez"). Plaintiff did not make any demand on the Board of Lehman

Brothers to institute this action because such a demand would have been a futile, wasteful and useless act.

109.    Defendant Fuld is liable to Lehman Brothers for the undeserved compensation that he received as a result of the stock options that he manipulated.  Specifically, Fuld received manipulated option grants on October 25, 1995, March 18, 1996, December 14, 1998, February 18, 2000, December 1, 2000 and December 3, 2001. Fuld is interested because he engaged in self dealing in that he authorized the grant of backdated options to himself and later sold shares, thus obtaining illegal proceeds at the Company's expense.  Accordingly, demand is futile as to Fuld because: (i) he faces a sufficiently substantial likelihood of liability in connection with his illegally manipulated Company stock options; and (ii) he has a financial interest in the options that he illegally manipulated and the proceeds they gained from the exercise of those options.

110.    As alleged above, Lehman Brothers' stock option plans vested the authority to administrate the plans upon the committees of the Board.  Thus, the committees of the Board are responsible for approving the compensation awarded to Lehman Brothers insiders.  This compensation includes the stock options that were secretly manipulated by Lehman Brothers insiders. The following chart details the defendants, who are currently members of the Board, who approved or acquiesced in the approval of manipulate options as directors and members of the Compensation and Audit Committees:

| Suspicious Options Grant Date | Audit Committee Members | Compensation and Benefits Committee Members | Members of the Board |
|---|---|---|---|
| October 25, 1995 | Berlind, Macomber | Macomber | Berlind, Fuld, Kaufman, Macomber |
| March 18, 1996 | Berlind | Macomber | Akers, Berlind, Fuld, Kaufman, Macomber |
| December 14, 1998 | Ainslie, Berlind, Cruikshank | Akers, Macomber | Ainslie, Akers, Berlind, Cruikshank, Fuld, Kaufman, Macomber |
| March 1, 1999 | Ainslie, Berlind, Cruikshank | Akers, Macomber | Ainslie, Akers, Berlind, Cruikshank, Fuld, Kaufman, Macomber |
| December 1, 2000 | Ainslie, Berlind, Cruikshank | Akers, Macomber | Ainslie, Akers, Berlind, Cruikshank, Fuld, Kaufman, Macomber |

| | | | Ainslie, Akers, Berlind, |
|---|---|---|---|
| | Ainslie, Berlind, | | Cruikshank, Fuld, |
| February 18, 2000 | Cruikshank | Akers, Macomber | Kaufman, Macomber |
| | | | Ainslie, Akers, Berlind, |
| September 20, | Ainslie, Berlind, | | Cruikshank, Fuld, |
| 2001 | Cruikshank | Akers, Macomber | Kaufman, Macomber |
| | | | Ainslie, Akers, Berlind, |
| | Ainslie, Berlind, | | Cruikshank, Fuld, |
| December 3, 2001 | Cruikshank | Akers, Macomber | Kaufman, Macomber |
| | | | Ainslie, Akers, Berlind, |
| | Ainslie, Berlind, | | Cruikshank, Fuld, |
| July 23, 2002 | Cruikshank | Akers, Macomber | Kaufman, Macomber |

The Board and its Committees should have properly informed itself of the circumstances surrounding the options granted to Lehman Brothers insiders before approving them. The fact that these options were routinely approved by the Committees of the Board when they were dated at or near the Company's lowest closing prices for the respective month in which the options were granted establishes that these decisions were not informed. Accordingly, there is reasonable doubt that defendants Fuld, Kaufman, Berlind, Macomber, Ainslie, Akers and Cruikshank are disinterested because they face sufficiently substantial liability for their breaches of fiduciary duty to Lehman Brothers. The Board and its Committee's decision to approve the options was not the product of valid business judgment. Thus, demand would have been futile as to defendants Fuld, Kaufman, Berlind, Macomber, Ainslie, Akers and Cruikshank.

111. The Compensation and Benefits Committee was specifically responsible for approving stock options grants to Lehman Brothers' executive officers and directors who received illegally manipulated option grants. As alleged above, the Compensation and Benefits Committee was specifically charged with the administration of the Employee and 1996 Plans. This duty was also specifically stated in Lehman Brothers' 2000 annual proxy which provides that the "[t]he Compensation Committee also establishes and administers all of the Company's employee benefit and compensation plans ..." Defendants Akers and Macomber as members of the Compensation and Benefits Committee approved manipulated stock option grants. Specifically, defendant Macomber approved manipulated option grants on October 25, 1995, March 18, 1996, December 14, 1998, March 1, 1999, December 1, 2000, February 18, 2000, September 20, 2001, December 3, 2001 and July 23, 2002; and defendant Akers approved manipulated options grants on December 14,

1998, March 1, 1999, December 1, 2000, February 18, 2000, September 20, 2001, December 3, 2001 and July 23, 2002. These defendants breached their fiduciary duties to Lehman Brothers because they did not act to inform themselves of the circumstances surrounding these option grants, thereby causing or allowing the Company's executives to obtain unreasonable and unreported compensation via the backdating of stock option grants. Specifically, these defendants willfully or recklessly ignored the following facts, among others:

- The March 18, 1996 was dated just before the release of positive material information that precipitated an 11% increase in Lehman Brothers' stock price.

- The October 26, 1996 grant was dated at the lowest share price for the five month period beginning August 18, 1995 through December 15, 1995.

- The December 14, 1998 grant was dated at the lowest share price for the 12 month period of November 18, 1998 through November 20, 1999.

- The March 1, 1999 grant was dated at the lowest share price for the 1½ month period beginning March 1, 1999 through April 16, 1999.

- The February 18, 2000 grant was dated at the lowest share price of Lehman Brothers' fiscal 2000.

- The December 1, 2000 grant was dated just before the release of positive material information that precipitated a 21% increase in Lehman Brothers' stock price.

- ***The September 20, 2001 grant was dated following the September 11, 2001 terrorist attack at the lowest share price for Lehman Brothers' fiscal 2001.***

- The December 3, 2001 grant was dated at the lowest share price for the three month period beginning November 5, 2001 through January 23, 2002.

- The July 23, 2002 grant was dated at the lowest share price for the 12 month period beginning September 24, 2001 through September 19, 2002.

Accordingly, there is reasonable doubt that Akers and Macomber are disinterested because they face sufficiently substantial liability for their breaches of fiduciary duty to Lehman Brothers. The Compensation Committee's decision to approve the options was not the product of valid business judgment. Thus, demand would have been futile as to defendants Akers and Macomber.

112.    Defendant Berlind was a member of the Audit Committee during the approval of manipulated option grants on October 25, 1995 and March 18, 1996; defendant Macomber was a member of the Audit Committee during the approval of manipulated options grants on March 18, 1996; and defendants Ainslie, Berlind and Cruikshank were members of the Audit Committee during the approval of manipulated options grants on December 14, 1998, March 1, 1999, December 1, 2000, February 18, 2000, September 20, 2001, December 3, 2001 and July 23, 2002. According to Lehman Brothers' 2000 annual proxy, the Audit Committee "represents the Board in discharging its responsibilities relating to the accounting, reporting and financial control practices of the Company." These accounting and financial control practices included Lehman Brothers' adherence to SFAS No. 123, "Accounting for Stock-Based Compensation" and Accounting Principles Board Opinion No. 25 ("APB 25"). Under SFAS No. 123 and APB 25, a compensation expense must be taken if options are not granted at fair market value. Because, defendants' illegally manipulated options resulted in below fair market value grants, Lehman Brothers must now restate it prior financials to record stock option compensation expenses. Accordingly, there is reasonable doubt that defendants Berlind, Macomber, Ainslie and Cruikshank are disinterested because they face sufficiently substantial liability for their breaches of fiduciary duty to Lehman Brothers. Thus, demand would have been futile as to defendants Berlind, Macomber, Ainslie and Cruikshank.

113.    Defendants Fuld, Kaufman, Berlind, Macomber, Ainslie, Akers, Cruikshank, Gent, Evans and Hernandez as members of the Board between 1997 and 2005 authorized the buyback of over $14.2 billion of the Company's shares at artificially inflated prices. The Board's decision to authorize the share buybacks was not the product of valid business judgment. Further, defendant Fuld engaged in self-dealing in that he sold his personally held shares while directing the Company to buyback shares. Accordingly, demand is futile.

114.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

115.    The Director Defendants of Lehman Brothers, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and

participated in efforts to conceal or disguise those wrongs from Lehman Brothers' stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

116.    In order to bring this suit, all of the directors of Lehman Brothers would have been forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they would not have done, thereby excusing demand.

117.    The acts complained of constitute violations of the fiduciary duties owed by Lehman Brothers' officers and directors and these acts are incapable of ratification.

118.    Lehman Brothers has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and Board have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct in an attempt to recover for Lehman Brothers any part of the damages the Company suffered and will suffer thereby.

119.    If Lehman Brothers' current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase such insurance for their protection with corporate funds, *i.e.*, monies belonging to Lehman Brothers' stockholders. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Lehman Brothers against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain Lehman Brothers officers, there would be no directors' and officers' insurance protection. If there is no directors' and officers' liability insurance, then the current directors will not cause Lehman Brothers to sue defendants, since they will face a large uninsured liability. This is a further reason why they would not have brought such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.

120. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the Board has failed and refused to seek to recover for Lehman Brothers for any of the wrongdoing alleged by plaintiff herein.

121. Plaintiff has not made any demand on shareholders of Lehman Brothers to institute this action since such demand would be a futile and useless act for the following reasons:

(a) Lehman Brothers is a publicly held company with over 526 million shares outstanding, and thousands of shareholders;

(b) Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c) Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## DEFENDANTS ACTIVELY CONCEALED THEIR ILLEGAL BACKDATING PRACTICES

122. At times relevant hereto, defendants took affirmative steps to conceal their options manipulation by authorizing or otherwise causing the Company to issue proxy statements, Form 3s, Form 4s, Form 5s, Form 10-Qs, Form 10-Ks and other SEC filings and public statements that contained false disclosures concerning the grant dates of options granted to Lehman Brothers insiders. These false disclosures prevented plaintiff from recognizing that Lehman Brothers insiders were illegally backdating their stock option grants.

123. Despite the increased scrutiny of options granted by publicly traded companies in the wake of the March 18, 2006 the *Wall Street Journal* article, defendants did not initiate any investigation of Lehman Brothers' prior option grant practices or institute corporate governance sufficient to prevent further options manipulations. Defendants actions appear calculated to maintain the concealment of their options manipulation practices.

124. Plaintiff's ignorance of defendants' illegal backdating practices was not attributable to a lack of due diligence. It would be unreasonable to expect plaintiff—a typical shareholder—to undertake costly and extensive academic research and statistical analysis when defendants' false

public statements indicated that stock options were being properly granted. In any case, plaintiff was entitled to rely upon the truthfulness of the disclosures contained within Lehman Brothers' public statements and SEC filings.

125.   In response to the increased general scrutiny of backdating at public companies, plaintiff conducted an investigation of defendants' prior option grants, discovered numerous suspicious grants dated at extremely favorable exercise prices and brought this action on behalf of Lehman Brothers to preserve the Company's claims against the wrongdoers responsible for illegal backdating.

126.   It is apparent that defendants' scheme to profit from the backdated option grants was continuous, dating back to 1995. Indeed, this scheme was a continuing and involved process that included: (i) the manipulation of option grant dates; (ii) the approval of manipulated grants; (iii) the holding of the manipulated grants throughout their respective vesting periods; (iv) the concealment of the backdated grants via improper disclosures in Lehman Brothers' SEC filings and other public statements; (v) the improper accounting for the backdated options over the vesting periods; and (vi) finally, the exercising of the backdated options for profit. This continuous scheme, although it stretches back over 12 years, has resulted in present day damages to Lehman Brothers that have only recently accrued as alleged above.

## COUNT I

### Against Defendants Fuld, Goldarb and O'Meara for Disgorgement under SOX

127.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.   Section 304 of SOX provides that if a public company prepares an accounting restatement due to material non-compliance with any financial reporting requirement under federal securities laws, and such non-compliance resulted from misconduct, then the company's chief executive officer and chief financial officer must reimburse the company for certain payments made

by the company to those executives. Section 304, entitled "Forfeiture of Certain Bonuses and Profits," provides in full:

> (a)    Additional compensation prior to noncompliance with commission financial reporting requirements. If an issuer is required to prepare an accounting restatement due to the material non-compliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for –
>
>> 1.    any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and
>>
>> 2.    any profits realized from the sale of securities of the issuer during that 12-month period.
>
> (b)    Commission exemption authority. The Commission may exempt any person from the application of subsection (a), as it deems necessary and appropriate.

129.    Lehman Brothers will likely restate its financial statements filed from 1995 to the present due to the material non-compliance of such statements with federal securities laws reporting requirements. These restatements resulted from "misconduct" within the meaning of Section 304 of the Sarbanes-Oxley Act of 2002. As a result, defendant Fuld as Lehman Brothers' CEO; defendant Goldfarb as Lehman Brothers' CFO from April 2000 through December 2004; and defendant O'Meara as Lehman Brothers' CFO from December 2004 to the present, are required to reimburse Lehman Brothers for all bonuses or other incentive-based or equity-based compensation received by them from the Company during the period July 30, 2002 (the date of enactment of the Sarbanes-Oxley Act of 2002) through the present.

130.    Further, defendants Fuld, Goldfarb and O'Meara also are liable to Lehman Brothers for any profits realized from the sales of securities by the Company during that same period of time.

131.    Defendants Fuld, Goldfarb and O'Meara are also liable to plaintiff for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of Lehman Brothers.

## COUNT II

### Derivatively Against All Defendants for Violation of §10(b) of the
### Exchange Act and Rule 10b-5 Promulgated Thereunder

132.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.    Between 1995 and the present, the Individual Defendants disseminated or approved financial statements that did not disclose the backdating practices that were occurring at Lehman Brothers and the resulting effects of those practices on the Company's financial results. Specifically, Lehman Brothers' financial statements included financial results that did not properly account for stock options that were granted below fair market value as required under GAAP. The Individual Defendants knew or recklessly disregarded the fact that the Company's financial statements were misleading—due to the stock options manipulations—in that the financial statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

134.    The Insider Selling Defendants also sold over 18 million shares of Lehman Brothers' common stock at inflated prices between April 1997 and the present, receiving over $1.4 billion in proceeds, while in possession of material non-public information. These defendants misappropriated Lehman Brothers' proprietary information and violated their "abstain or disclose" duties under the federal securities laws when they sold Lehman Brothers stock without disclosing the information alleged to have been concealed herein.

135.    At the same time the price of the Company's common stock was inflated due to the improperly accounted for stock options and the Insider Selling Defendants were selling stock into the market, the Individual Defendants were causing Lehman Brothers to repurchase $14.2 billion worth of its own stock on the open market at inflated prices.

136.    As such, the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

        (a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lehman Brothers and others in connection with their purchases of Lehman Brothers common stock during the Relevant Period.

137.    As a result of the Individual Defendants' misconduct, Lehman Brothers has and will suffer damages in that it paid artificially inflated prices for Lehman Brothers common stock purchased on the open market.  Lehman Brothers would not have purchased Lehman Brothers common stock at the prices it paid, had the market previously been aware that the market price of Lehman Brothers' stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Lehman Brothers suffered damages in connection with its purchases of Lehman Brothers common stock during the Relevant Period.  By reason of such conduct, the Individual Defendants are liable to the Company pursuant to §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT III

### Against the Options Recipient Defendants for Breach of Fiduciary Duty for Unjust Enrichment

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Lehman Brothers.  These wrongful acts included the approval of improperly manipulated stock options by the Director Defendants and defendants Russo, Goldfarb, O'Meara and Welikson as well as the receipt of undeserved compensation in connection with those options by the Options Recipient Defendants.

140.    Plaintiff, as a shareholder and representative of Lehman Brothers, seeks restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits,

benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV

**Against the Director Defendants and defendants Russo, Goldfarb, O'Meara and Welikson for Breach of Fiduciary Duty for Approving Improperly Manipulated Stock Option Grants to the Options Recipient Defendants**

141.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.    The Director Defendants and defendants Russo, Goldfarb, O'Meara and Welikson owed and owe Lehman Brothers fiduciary obligations. By reason of their fiduciary relationships, these defendants owed and owe Lehman Brothers the highest obligation of good faith, fair dealing, loyalty and due care.

143.    The Director Defendants and defendants Russo, Goldfarb, O'Meara and Welikson, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

144.    Each of the Director Defendants and defendants Russo, Goldfarb, O'Meara and Welikson had actual or constructive knowledge that they had approved the improper manipulation of stock option grants and the corresponding issuance of inaccurate financial results that did not properly account for the stock option grants and failed to correct or prevent these improprieties. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

145.    As a direct and proximate result of the Director Defendants and defendants Russo, Goldfarb, O'Meara, Welikson's failure to perform their fiduciary obligations, Lehman Brothers has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

146.    Plaintiff on behalf of Lehman Brothers has no adequate remedy at law.

### COUNT V

#### Against the Insider Selling Defendants for Breach of Fiduciary
#### Duties for Insider Selling and Misappropriation of Information

147.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.    At the time of the stock sales stated herein, the Insider Selling Defendants knew the information described above, and sold Lehman Brothers common stock on the basis of such information.

149.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Lehman Brothers common stock.

150.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated because of the undisclosed stock option and other related compensation expenses.  The Insider Selling Defendants' sales of Lehman Brothers common stock while in possession and control of this material adverse and non-public information was a breach of their fiduciary duties of loyalty and good faith.

151.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

### COUNT VI

#### Against All Defendants for Abuse of Control

152.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Lehman Brothers, for which they are legally responsible.

154.    As a direct and proximate result of the Individual Defendants' abuse of control,

- 65 -

Lehman Brothers has sustained significant damages.

155.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

156.    Plaintiff on behalf of Lehman Brothers has no adequate remedy at law.

### COUNT VII

**Against All Defendants for Breach of Fiduciary Duty for Gross Mismanagement**

157.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Lehman Brothers in a manner consistent with the operations of a publicly held corporation.

159.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Lehman Brothers has sustained significant damages.

160.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

161.    Plaintiff on behalf of Lehman Brothers has no adequate remedy at law.

### COUNT VIII

**Against All Defendants for Waste of Corporate Assets**

162.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.    As a result of the improprieties alleged herein, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Lehman Brothers to waste valuable corporate assets and incur costs to conduct investigations, hire outside counsel, accounting firms and consultants, and to direct manpower to the task of potentially restating Lehman Brothers' past financials to correct for the improperly manipulated stock option grants.

164.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

165.    Plaintiff on behalf of Lehman Brothers has no adequate remedy at law.

## COUNT IX

### Against the Options Recipient Defendants, Director Defendants and defendants Russo, Goldfarb, O'Meara and Welikson for an Accounting

166.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

167.    At all relevant times, the defendants, as directors and/or officers of Lehman Brothers, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

168.    In breach of their fiduciary duties owed to Lehman Brothers and its shareholders, the Director Defendants and defendants Russo, Goldfarb, O'Meara and Welikson authorized the granting of manipulated-Lehman Brothers stock options to themselves, the Options Recipient Defendants and/or certain other Lehman Brothers insiders. By this wrongdoing, the defendants breached their fiduciary duties owed to Lehman Brothers and its shareholders.

169.    The Director Defendants, Options Recipient Defendants and defendants Russo, Goldfarb, O'Meara and Welikson possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly manipulated stock option grants to the defendants.

170.    As a result of defendants' misconduct, Lehman Brothers has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

171.    Plaintiff demands an accounting be made of all stock options grants made to defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the Options Recipient Defendants, as well as the disposition of any proceeds received by the Options Recipient

Defendants, via sale or other exercise of manipulated stock option grants received by the Options Recipient Defendants.

## COUNT X

### Against the Options Recipient Defendants for Rescission

172.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

173.    As a result of the acts alleged herein, the stock option contracts between the Options Recipient Defendants and Lehman Brothers entered into during the relevant period were obtained through defendants' breaches of fiduciary duties, unjust enrichment, gross mismanagement and abuse of control. Further, the backdated stock options were illegal in that they were illegally backdated in violation of applicable law. Moreover, the Director Defendants and defendants Russo, Goldfarb, O'Meara and Welikson authorized these options in breach of the terms of the publicly filed employment agreements and the Company's stock option plans, which were also approved by Lehman Brothers shareholders and filed with the SEC. Consequently, the option grants are void.

174.    All contracts which provide for stock option grants between the Options Recipient Defendants and Lehman Brothers and were entered into during times relevant hereto should, therefore, be rescinded, with all sums, proceeds and profits under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT XI

### Against the Options Recipient Defendants, Director Defendants and defendants Russo, Goldfarb, O'Meara and Welikson for Constructive Trust

175.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

176.    As a result of the acts alleged herein, the Director Defendants and defendants Russo, Goldfarb, O'Meara and Welikson authorized the grant of manipulated or otherwise manipulated equity based compensation to themselves and other Lehman Brothers insiders. In effect, these manipulated options and other manipulated equity or incentive based compensation constitutes

- 68 -

illegal compensation in violation of Lehman Brothers' stock option plans, employment contracts and other compensation polices.

177.    The Company has a right for the return of this compensation because it was illegally authorized by the Director Defendants and defendants Russo, Goldfarb, O'Meara and Welikson and paid out of the Company's assets.

178.    The Options Recipient Defendants and other Lehman Brothers insiders profited from the illegally backdated options by wrongful acts.

179.    Accordingly, plaintiff seeks a declaratory judgment that the illicit stock options, and all proceeds derived from exercise thereof and any assets or other property acquired in connection therewith, are and have been held in constructive trust for the Company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demand judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Declaring that defendants Fuld, Goldarb and O'Meara are liable under §302 of the Sarbanes-Oxley Act of 2002, and requiring them to reimburse Lehman Brothers for all bonuses or other incentive based or equity based compensation received by them during the period in which Lehman Brothers will restate its financial results;

C.    Declaring that the Individual Defendants are liable under of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder for directing Lehman Brothers to repurchase $14.2 billion of its stock at artificially inflated prices and awarding Lehman Brothers damages;

D.    Directing Lehman Brothers to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Lehman Brothers and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's

By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to remove from the Board and its committees all directors who are found to have participated in the illegal stock options manipulations;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

3.    a proposal to ensure that all stock options granted to executive and non-executive employees are properly awarded, valued and administered;

4.    a provision to control and limit insider stock selling;

5.    a provision to permit the shareholders of Lehman Brothers to nominate at least three candidates for election to the Board; and

6.    a proposal to appropriately test and then strengthen the internal audit and control functions.

E.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions issued hereunder, including attaching, impounding or otherwise restricting the proceeds of defendants' trading activities, manipulated stock options or their other assets so as to assure that plaintiff, on behalf of Lehman Brothers, has an effective remedy;

F.    Directing an accounting of all undisclosed manipulated stock options granted, directing that all the unexercised backdated and/or improperly manipulated options granted to defendants be cancelled, ordering the financial gains obtained via the exercise of such stock options returned to the Company, and ordering Lehman Brothers to revise the Company's financial statements to reflect the truth concerning these option grants;

G.    Declaring that all stock options that were issued to defendants and illegally manipulated are void and all proceeds from their exercise or sale are and have been held in constructive trust by defendants for the Company;

H.    Declaring that defendants' illicit and illegally obtained stock options, and all proceeds derived from the exercise thereof, and any assets or other property acquired in connection therewith,

are and have been held in constructive trust by defendants for the Company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation;

I.       Awarding to Lehman Brothers restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants through the improper manipulating of stock option grants;

J.       Awarding to plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

K.       Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  May 1, 2007                          LAW OFFICES OF THOMAS G. AMON
                                             THOMAS G. AMON

                                             _____
                                                      THOMAS G. AMON

                                             500 Fifth Avenue, Suite 1650
                                             New York, NY 10110
                                             Telephone:  (212) 810-2431
                                             Facsimile:  (212) 810-2427

                                             ROBBINS UMEDA & FINK, LLP
                                             BRIAN J. ROBBINS
                                             JEFFREY P. FINK
                                             FELIPE ARROYO
                                             ARSHAN AMIRI
                                             610 West Ash Street, Suite 1800
                                             San Diego, CA 92101
                                             Telephone: (619) 525-3990
                                             Facsimile: (619) 525-3990

                                             Attorneys for Plaintiff

- 71 -